124 T.C. No. 15


UNITED STATES TAX COURT


EDWARD R. AREVALO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13272-04.                    Filed May 18, 2005.


        P entered into a contract with American
Telecommunications Co., Inc. (ATC).  Under the terms of
the contract, P paid $10,000 to ATC and ATC provided P
with legal title to two pay telephones (pay phones).  P
also entered into a service agreement with Alpha
Telcom, Inc. (Alpha Telcom), the parent company of ATC,
under which Alpha Telcom serviced the pay phones and
retained most of the profits.

        1.  <u>Held</u>:  Because P did not have the benefits and
burdens of ownership with respect to the pay phones, P
did not have a depreciable interest in the pay phones.
Therefore, P is not entitled to claim a deduction for
depreciation with respect to the pay phones in 2001.

        2.  <u>Held</u>, <u>further</u>, because P's pay phone
activities did not obligate him to comply with the
requirements set forth in either title III or title IV
of the Americans with Disabilities Act of 1990, Pub. L.
101-336, 104 Stat. 353, 366, P's $10,000 investment in

the pay phones is not an eligible access expenditure. Therefore, P is not entitled to claim the disabled access credit under sec. 44, I.R.C., for his investment in the pay phones in 2001.

Edward R. Arevalo, pro se.

Catherine S. Tyson, for respondent.

OPINION

COHEN, Judge:  Respondent determined a deficiency of $1,999 in petitioner's Federal income tax for 2001 that was attributable to respondent's disallowance of depreciation deductions and tax credits claimed by petitioner with respect to two public pay telephones (pay phones).  In an amendment to answer, respondent asserted an increased deficiency of $30,247 and a penalty of $6,049 under section 6662 as a result of petitioner's failure to report income from dividends and stock sales.  After concessions by the parties, the issues for decision are:

(1) Whether petitioner is entitled to claim a deduction for depreciation under section 167 with respect to the pay phones in 2001 and

(2) whether petitioner is entitled to claim a tax credit under section 44 for his investment in the pay phones in 2001.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and

all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

This case was submitted on a stipulation of facts and supplemental stipulation of facts, and the stipulated facts are incorporated in our findings by this reference. Petitioner resided in Austin, Texas, at the time that he filed his petition.

Petitioner's Investment in the Pay Phones

On June 7, 2001, petitioner entered into a contract with American Telecommunications Co., Inc. (ATC), a wholly owned subsidiary of Alpha Telcom, Inc. (Alpha Telcom), entitled "Telephone Equipment Purchase Agreement" (ATC pay phone agreement). Under the terms of the ATC pay phone agreement, petitioner paid $10,000 to ATC, and ATC provided him with legal title to the "telephone equipment" that was purportedly described in an attachment to the ATC pay phone agreement entitled "Telephone Equipment List". The attachment, however, did not identify any pay phones subject to the agreement. The ATC pay phone agreement also included the following provision:

1. Bill of Sale and Delivery

a. Delivery by Seller shall be considered complete upon delivery of the Equipment to such place(s) as are designated by Owner.

b. Owner agrees to take delivery of Equipment within (15) fifteen business days. If Seller has not delivered the equipment within (90) ninety days, Owner

may terminate this Agreement upon Seller's receipt of signed notice from Purchaser.

c.    Upon delivery, Owner shall acquire all rights, title and interest in and to the Equipment purchased.

Exhibit E, "Buy Back Election", to the ATC pay phone

agreement stated:

1.0  Buy Back Election:  Should Owner elect to sell any telephone equipment, itemized in Exhibit "A", American Telecommunications Company, Inc., (hereinafter "Seller"), agrees to buy back such equipment from Owner, according to the following terms and conditions: 1) If exercise of the buy back election occurs in the first thirty-six months after the equipment delivery date, the re-sale price shall be the Owner's original purchase price of $5,000.00, minus a "restocking fee" of (10%) ten percent of the purchase price; 2) If the buy-back election is made more than (36) thirty-six months after the equipment delivery date, the sale price shall be the Owner's original purchase price of $5,000.00, and there shall be no "restocking fee" for Purchaser's election to re-sell the equipment purchased back to Seller.  This "Buy Back Election" shall expire on the (84th) eighty-fourth month anniversary of Owner's equipment delivery date.  3) Seller, or its designee, reserves the right of first refusal as to the telephone equipment.  If Owner enters into an agreement to sell the telephone equipment to any third party, Seller, or its designee, shall have thirty (30) days to match any legitimate offer to purchase said equipment received by Owner.

Exhibit E further stated:

4.0  Maintenance Requirements For Buy Back Provision: If Purchaser elects to require Seller to re-purchase the Pay Telephone Equipment, Purchaser must establish to Seller's satisfaction that all repairs and maintenance, as set forth in Exhibit "B", have been performed as required.  This means that the regular maintenance "recommended" in Exhibit "B" is mandatory. Purchaser will establish that regular maintenance and repairs have been performed on the Equipment by maintaining a logbook.  The logbook must set forth the dates and times maintenance and repairs were made to

the Equipment, who performed the repairs and maintenance, and by retaining receipts and cancelled checks for all parts, service, and repairs made to the Equipment. Purchaser will be required to surrender, to Seller, the logbook and all other proof establishing that required maintenance and repairs were performed. Purchaser must also establish to Seller's satisfaction the person(s) who performed the repairs and maintenance were qualified to do so.

Exhibit B to the ATC pay phone agreement set forth a recommended schedule of weekly maintenance work to be performed on the pay phones by petitioner. Exhibit C to the ATC pay phone agreement included a list of service providers available to maintain the pay phones should petitioner not want to service the phones himself. Petitioner also had the option to enter into a service agreement with Alpha Telcom (Alpha Telcom service agreement) if he did not want to be involved in the day-to-day maintenance of the pay phones.

Under the terms of the Alpha Telcom service agreement, Alpha Telcom agreed to service and maintain the pay phones for an initial term of 3 years in exchange for 70 percent of the pay phones' monthly adjusted gross revenue and all "dial around fees" generated by the pay phones. In the event that a pay phone's adjusted gross revenue was less than $194.50 for the month, Alpha Telcom would waive or reduce the 70-percent fee and pay petitioner at least $58.34, so long as the equipment generated at least that amount. In the event that a pay phone's adjusted gross revenue was less than $58.34 for the month, petitioner

would receive 100 percent of the revenue. Notwithstanding the terms of the Alpha Telcom service agreement, Alpha Telcom made it a practice to pay $58.34 per month per pay phone regardless of how little income the pay phone produced. Additionally, under the Alpha Telcom service agreement, Alpha Telcom negotiated the site agreement with the owner or leaseholder of the premises where the pay phones were to be installed, installed the pay phones, paid the insurance premiums on the pay phones, collected and accounted for the revenues generated by the pay phones, paid vendor commissions and fees, obtained all licenses needed to operate the pay phones, and took all actions necessary to keep the pay phones in working order. Petitioner signed the Alpha Telcom service agreement on June 7, 2001, the same day that he signed the ATC pay phone agreement.

In a letter dated June 11, 2001, petitioner received confirmation of his pay phone order and notice that an order had been placed for the installation of the pay phones. Petitioner had no say as to which pay phones were assigned to him, and he was not informed as to the location of these pay phones.

Thell G. Prueitt (Prueitt), an agent and sales representative for ATC, informed petitioner that the income from the pay phones was taxable but that the pay phones were depreciable property and, thus, petitioner could claim a depreciation deduction with respect to the pay phones.

Petitioner claimed a $714 depreciation deduction with respect to the pay phones on the Schedule C, Profit or Loss From Business, that was attached to his income tax return for 2001. Petitioner reported no other items of income or expense on this Schedule C.

Prueitt also informed petitioner that all of the amounts that petitioner spent in connection with the pay phones qualified for the tax credit granted under section 44 for compliance with the Americans with Disabilities Act of 1990 (ADA), Pub. L. 101-336, 104 Stat. 327. Additionally, petitioner received a copy of a letter dated March 4, 1999, in which George Mariscal, president of Tax Audit Protection, Inc., informed Paul Rubera (Rubera), president of Alpha Telcom, that "Persons or companies that own pay telephones that have been modified for use by the disabled individual are eligible for the tax credit as per the Internal Revenue Code section outlined in this letter [i.e., section 44]". Petitioner also received a copy of a letter dated June 7, 1999, in which Fred H. Williams of Perkins & Co., P.C., opined to Rubera that "The purchase of these payphones is an expenditure which qualifies for the Disabled Access Credit".

A salesperson for Alpha Telcom informed petitioner that the pay phones were modified by (1) lengthening the cords and/or reducing the height to make the pay phones accessible to the wheelchair bound and/or (2) installing volume controls to make them more useful to the hearing impaired. Alpha Telcom

represented to investors that these modifications made the pay phones compliant with the ADA. The ATC pay phone agreement also stated: "Phones have approved installation under the * * * [ADA]". Petitioner was not provided with a list of the modifications that were made to the pay phones that were assigned to him, and he did not know the cost of these modifications. Petitioner claimed a $1,894 tax credit with respect to the pay phones on Form 8826, Disabled Access Credit, that was attached to his income tax return for 2001. For purposes of claiming this credit, petitioner reported that he had $10,000 of "eligible access expenditures" during 2001.

Alpha Telcom grew rapidly but was poorly managed and ultimately operated at a loss. On August 24, 2001, Alpha Telcom filed for bankruptcy under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Florida. The case was later transferred to the U.S. Bankruptcy Court for the District of Oregon on September 17, 2001. On March 15, 2002, petitioner filed a proof of claim in the bankruptcy court in the amount of $11,166.80, representing the $10,000 that he had invested plus approximately 9 or 10 months of payments that he had not received from ATC as of the claim date. The bankruptcy case was dismissed on September 10, 2003, by motion of Alpha Telcom. The bankruptcy court held that it was "in the best interest of creditors and the estate to dismiss so that

proceedings could continue in federal district court, where there was a pending receivership involving debtors."

The receivership was the result of a civil enforcement action brought by the Securities and Exchange Commission (SEC) against Alpha Telcom in 2001 in the U.S. District Court for the District of Oregon. The District Court appointed a receiver in September 2001 to take over the operations of Alpha Telcom and to investigate its financial condition. On February 7, 2002, the District Court held that the pay phone scheme was actually a security investment and that Federal law had been violated by Alpha Telcom because the program had not been registered with the SEC. The U.S. Court of Appeals for the Ninth Circuit affirmed this decision on December 5, 2003.

Petitioner's Unreported Income

During 2001, petitioner received proceeds of $146,912.28 from the sale of stocks from his USB PaineWebber brokerage account. Petitioner also received dividends of $5,982.05 during 2001. Petitioner did not report the stock sales or dividends on his income tax return for 2001. Respondent has conceded that the stock sales did not result in taxable gains.

Internal Revenue Service Determinations

The Internal Revenue Service (IRS) disallowed the depreciation deduction claimed by petitioner because "the telephone is located in a place that * * * [petitioner did] not

own or operate as a trade or business and * * * [petitioner] did not have depreciable interest in the pay phone". The IRS also disallowed the disabled access credit claimed by petitioner because "no business reason has been given or verified to comply with ADA of 1990".

Procedural Matters

The petition in this case was prepared by the office of Tom Buck, C.P.A. (Buck), and was filed with the Court on July 26, 2004. Buck's letterhead asserts: "Understanding how to play the game is half the battle." On September 8, 2004, Buck sent a letter to petitioner that stated that "my purpose was to work within the IRS system to buy you as much time as possible, before the IRS has a legal right to enforce collection action against you." By notice served October 5, 2004, this case was set for trial on March 7, 2005. Petitioner failed and refused to appear for trial and attempted to withdraw his petition through a letter received by the Court on the day of trial.

## Discussion

Burden of Proof

As a preliminary matter, we note that section 7491 is applicable to this case because the examination in connection with this action was commenced after July 22, 1998, the effective date of that section. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c)(1), 112

Stat. 727. Under section 7491, the burden of proof shifts from the taxpayer to the Commissioner if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's tax liability. Sec. 7491(a)(1). However, section 7491(a)(1) applies with respect to an issue only if the taxpayer has complied with the requirements under the Code to substantiate any item, has maintained all records required under the Code, and has cooperated with reasonable requests by the Commissioner for witnesses, information, documents, meetings, and interviews. See sec. 7491(a)(2)(A) and (B).

Petitioner failed to appear at trial or to produce any credible evidence. Petitioner has no records or information as to where the pay phones are located or as to the amount of revenue that they produced. Therefore, the burden of proof has not shifted to respondent. Nonetheless, our findings in this case are based on a preponderance of the evidence.

Depreciation Deduction

Section 167(a) allows as a depreciation deduction a reasonable allowance for the "exhaustion, wear and tear" of property (1) used in a trade or business or (2) held for the production of income. Sec. 167(a)(1) and (2). Depreciation deductions are based on an investment in and actual ownership of property rather than the possession of bare legal title. See Grant Creek Water Works, Ltd. v. Commissioner, 91 T.C. 322, 326

(1988); see also <u>Narver v. Commissioner</u>, 75 T.C. 53, 98 (1980), affd. 670 F.2d 855 (9th Cir. 1982). "In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred." <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 572-573 (1978). "'[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed'". <u>Grodt & McKay Realty, Inc. v. Commissioner</u>, 77 T.C. 1221, 1236 (1981) (quoting <u>Corliss v. Bowers</u>, 281 U.S. 376, 378 (1930)); see also <u>United States v. W.H. Cocke</u>, 399 F.2d 433, 445 (5th Cir. 1968). Therefore, when a taxpayer never actually owns the property in question, the taxpayer is not allowed to claim deductions for depreciation. See <u>Grodt & McKay Realty, Inc. v. Commissioner</u>, <u>supra</u> at 1236-1238; see also <u>Schwartz v. Commissioner</u>, T.C. Memo. 1994-320, affd. without published opinion 80 F.3d 558 (D.C. Cir. 1996).

A taxpayer has received an interest in property that entitles the taxpayer to depreciation deductions only if the benefits and burdens of ownership with respect to the property have passed to the taxpayer. See <u>Grodt & McKay Realty, Inc. v. Commissioner</u>, <u>supra</u> at 1237-1238; see also <u>Grant Creek Water Works, Ltd. v. Commissioner</u>, <u>supra</u> at 326. Whether the benefits and burdens of ownership with respect to property have passed to

the taxpayer is a question of fact that must be ascertained from the intention of the parties as established by the written agreements read in light of the attending facts and circumstances. Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237. Thus, the Court will look to the substance of the agreement between the taxpayer and the seller and not just to the labels used in those agreements. Sprint Corp. v. Commissioner, 108 T.C. 384, 397 (1997); cf. Gregory v. Helvering, 293 U.S. 465, 468-470 (1935). Some of the factors that have been considered by courts include: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238.

Petitioner contends that he "purchased" the pay phones from ATC and, therefore, held the benefits and burdens of ownership with respect to the pay phones. After considering the relevant factors and weighing the facts and circumstances surrounding the

transactions among petitioner, ATC, and Alpha Telcom, we reject petitioner's contention for the reasons discussed below.

First, petitioner had no control over the pay phones, never had possession of the pay phones, and does not know what the pay phones look like or where they are located. Petitioner signed an agreement containing blank spaces where the pay phones were to be identified.

Second, petitioner never had the power to select the location of the pay phones or enter into site agreements with the owners or leaseholders of the premises where the pay phones were to be located; that power was held by Alpha Telcom through the Alpha Telcom service agreement.

Third, no evidence indicates that petitioner paid any property taxes, insurance premiums, or license fees with respect to the pay phones.

Fourth, there was minimal risk of loss for petitioner because the ATC pay phone agreement, in combination with the Alpha Telcom service agreement, allowed petitioner to sell legal title to the pay phones back to ATC for 10 percent less than the amount that he invested in them in the first 36 months and for the full amount that he invested in them after 36 months.

Fifth, under the terms of the Alpha Telcom service agreement, Alpha Telcom was entitled to receive most of the profits from the pay phones.

Sixth, at the time that Alpha Telcom declared bankruptcy, petitioner filed a claim in bankruptcy court for the "price" of the pay phones and the monthly payments that he had not received from ATC, rather than taking possession of the pay phones or hiring an alternative service provider to maintain the pay phones.  This action supports the conclusion that petitioner was not the actual owner of the pay phones.

Seventh, although petitioner received legal title to the pay phones under the terms of the ATC pay phone agreement, the Alpha Telcom service agreement passed all of the responsibilities for maintaining the pay phones and the risks associated with the pay phones' producing insufficient revenues to Alpha Telcom. Therefore, when the ATC pay phone agreement and the Alpha Telcom service agreement are construed together, it becomes clear that petitioner received nothing more than bare legal title with respect to the pay phones.

Eighth, the transaction into which petitioner entered with ATC was more akin to a security investment than a sale.  In essence, petitioner made a one-time payment of $10,000 to ATC for the opportunity to receive (1) a minimum annual return of 14 percent on that investment, i.e., a minimum monthly payment of $58.34 per pay phone, and (2) the tax benefits that he believed would result from his nominal "ownership" of the pay phones.

Therefore, based upon our analysis of the facts and circumstances surrounding the transactions among petitioner, ATC, and Alpha Telcom, we conclude that petitioner did not receive the benefits and burdens of ownership with respect to the pay phones. Because petitioner never received a depreciable interest in the pay phones, he is not entitled to claim a depreciation deduction under section 167 with respect to them.

ADA Tax Credit

For purposes of the general business credit under section 38, section 44(a) provides a disabled access credit for certain small businesses. The amount of this credit is equal to 50 percent of the "eligible access expenditures" of an "eligible small business" that exceed $250 but that do not exceed $10,250 for the year. Sec. 44(a). Therefore, in order to claim the disabled access credit, a taxpayer must demonstrate that (1) the taxpayer is an "eligible small business" for the year in which the credit is claimed and (2) the taxpayer has made "eligible access expenditures" during that year. If the taxpayer cannot fulfill both of these requirements, the taxpayer is not eligible to claim the credit for that year.

For purposes of section 44, the term "eligible small business" is defined as any person that (1) had gross receipts of no more than $1 million for the preceding year or not more than 30 full-time employees during the preceding year and (2) elects

the application of section 44 for the year.  Sec. 44(b).  The term "eligible access expenditure" is defined as an amount paid or incurred by an eligible small business for the purpose of enabling the eligible small business to comply with the applicable requirements under the ADA.  Sec. 44(c)(1).  Such expenditures include amounts paid or incurred (1) for the purpose of removing architectural, communication, physical, or transportation barriers that prevent a business from being accessible to, or usable by, individuals with disabilities; (2) to provide qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments; (3) to acquire or modify equipment or devices for individuals with disabilities; or (4) to provide other similar services, modifications, materials, or equipment. See sec. 44(c)(2).  However, eligible access expenditures do not include expenditures that are unnecessary to accomplish such purposes.  See sec. 44(c)(3).  Additionally, eligible access expenditures do not include amounts that are paid or incurred for the purpose of removing architectural, communication, physical, or transportation barriers that prevent a business from being accessible to, or usable by, individuals with disabilities with respect to any facility first placed in service after November 5, 1990.  See sec. 44(c)(4).

Petitioner contends that he is eligible to claim the disabled access credit under section 44(a) because (1) his pay phone "business" was an eligible small business during 2001 and (2) his $10,000 investment in the pay phones was an eligible access expenditure.  In the notice of deficiency that respondent sent to petitioner, respondent disallowed petitioner's claim for the disabled access credit because no "business reason" had been given for petitioner to comply with the ADA.  In respondent's trial memorandum, respondent contends that petitioner's $10,000 investment in the pay phones is not an eligible access expenditure because it "is not at all clear that Petitioner was required to be compliant with the ADA".  In addition, respondent contends that petitioner's pay phone activities do not qualify as an eligible small business because petitioner "was not in a business".  Because we conclude that petitioner's $10,000 investment in the pay phones does not constitute an eligible access expenditure, it is unnecessary for us to consider whether petitioner's pay phone activities constituted an eligible small business during 2001.

In order for an expenditure to qualify as an eligible access expenditure within the meaning given that term by section 44(c), it must have been made to enable an eligible small business to comply with the applicable requirements under the ADA.  See Fan v. Commissioner, 117 T.C. 32, 38-39 (2001).  Consequently, a

person who does not have an obligation to become compliant with the requirements set forth in the ADA could never make an eligible access expenditure.  As relevant here, the requirements set forth in the ADA apply to (1) persons who own, lease, lease to, or operate certain "public accommodations" and (2) "common carriers" of telephone voice transmission services.  See 42 U.S.C. sec. 12182(a) (2000); see also 47 U.S.C. sec. 225(c) (2000).  As discussed below, petitioner neither owned, leased, leased to, or operated a public accommodation during 2001, nor was he a "common carrier" of telephone voice transmission services during 2001.  Accordingly, petitioner was under no obligation to become compliant with the requirements set forth in the ADA during that year.

The general rule of ADA title III is that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, leases to, or operates a place of public accommodation.  42 U.S.C. sec. 12182(a).  Thus, the ADA requires persons who own, lease, lease to, or operate places of public accommodation to make reasonable modifications in policies, practices, or procedures when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to

individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. sec. 12182(b)(2)(A)(ii). Additionally, the ADA requires persons who own, lease, lease to, or operate places of public accommodation to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently from other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. sec. 12182(b)(2)(A)(iii).

To summarize, any person who owns, leases, leases to, or operates a public accommodation is required to make modifications for disabled individuals in order to comply with the requirements set forth in ADA title III. While ADA title III does not define the terms "own", "lease", "lease to", or "operate", we must construe those terms in accord with their ordinary and natural meaning. See, e.g., Smith v. United States, 508 U.S. 223, 228 (1993); Neff v. Am. Dairy Queen Corp., 58 F.3d 1063, 1066 (5th Cir. 1995) (construing the term "operate", as used in ADA title III, as follows: "To 'operate,' in the context of a business

operation, means 'to put or keep in operation,' 'to control or direct the functioning of,' 'to conduct the affairs of; manage,'" (citations omitted)). For the reasons discussed above, we concluded that petitioner did not own the pay phones in which he invested and had no involvement in their operation. Thus, petitioner did not own, lease, lease to, or operate anything as a result of his investment in the pay phones and was never under any obligation to comply with the requirements of ADA title III during 2001. We reach this conclusion without deciding whether pay phones constitute public accommodations within the meaning given that term by the ADA.

ADA title IV requires common carriers providing telephone voice transmission services to provide "telecommunications relay services" throughout the area in which they offer service. 47 U.S.C. sec. 225(c). Telecommunications relay services are defined as telephone transmission services that provide the ability for an individual who has a hearing impairment or speech impairment to engage in communication by wire or radio with a hearing individual in a manner that is functionally equivalent to the ability of an individual who does not have a hearing impairment or speech impairment to communicate using voice communication services by wire or radio. 47 U.S.C. sec. 225(a)(3). For purposes of ADA title IV, a common carrier is any person engaged as a common carrier for hire, in intrastate or

interstate communication by wire or radio.  See 47 U.S.C. sec. 225(a)(1); see also 47 U.S.C. sec. 153(10).

It has long been held that "'a common carrier is such by virtue of his occupation,' that is by the actual activities he carries on".  Natl. Association of Regulatory Util. Commrs. v. FCC, 533 F.2d 601, 608 (D.C. Cir. 1976) (quoting Washington ex rel. Stimson Lumber Co. v. Kuykendall, 275 U.S. 207, 211-212 (1927)); see also United States v. California, 297 U.S. 175, 181 (1936).  Furthermore, under common law principles, the "primary sine qua non of common carrier status is a quasi-public character, which arises out of the undertaking 'to carry for all people indifferently'".  Natl. Association of Regulatory Util. Commrs. v. FCC, supra at 608 (quoting Semon v. Royal Indem. Co., 279 F.2d 737, 739 (5th Cir. 1960)).  Accordingly, a person is not a common carrier unless the person is actively engaged in the provision of services to others.  Because petitioner did not own the pay phones in which he invested and had no involvement in their operation, petitioner was not actively engaged in the provision of services to anyone as a result of his investment in the pay phones.  Therefore, petitioner was under no obligation to comply with the requirements set forth in ADA title IV during 2001.

Because petitioner's pay phone activities did not obligate him to comply with the requirements set forth in either ADA

title III or title IV, his $10,000 investment in the pay phones is not an eligible access expenditure. Therefore, petitioner is not entitled to claim the disabled access credit under section 44 for his investment in the pay phones in 2001.

Section 6673

Whenever it appears to the Court that proceedings before it have been instituted or maintained primarily for delay, the Court, in its decision, may require the taxpayer to pay to the United States a penalty not in excess of $25,000. Sec. 6673(a)(1)(A). In this case, petitioner was advised that the purpose of filing the petition was to delay the collection process. Petitioner engaged in the required stipulation process but did not appear for trial. We have decided not to impose a section 6673 penalty in this case, but taxpayers are warned that sanctions may be appropriate if the Court concludes that a petition was filed with no intention to prosecute the case and merely to delay the collection process.

To reflect the foregoing and the concessions of the parties,

Decision will be entered
under Rule 155.