T.C. Summary Opinion 2005-121

UNITED STATES TAX COURT

KENNETH R. DUNN AND DELIA H. DUNN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14991-03S.                Filed August 11, 2005.

Kenneth R. Dunn and Delia H. Dunn, pro se.

<u>Lauren B. Epstein</u>, for respondent.

PANUTHOS, <u>Chief Special Trial Judge</u>:  This case was heard
pursuant to the provisions of section 7463 of the Internal
Revenue Code in effect when the petition was filed.  The decision
to be entered is not reviewable by any other court, and this
opinion should not be cited as authority.  Unless otherwise
indicated, all subsequent section references are to the Internal
Revenue Code (Code) in effect at relevant times, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency of $11,362 in petitioners' Federal income tax for the taxable year 1999. The deficiency was due, in part, to respondent's disallowance of a depreciation deduction and disallowance of a tax credit regarding petitioners' investment in two pay telephones (pay phones).

After concessions by the parties,[1] the issues for decision are: (1) Whether petitioners are entitled to claim a deduction for depreciation under section 167 for two pay phones in 1999; (2) whether petitioners are entitled to claim a tax credit under section 44 for their investment in the pay phones in 1999; and (3) whether petitioners are entitled to claim a loss under section 165(c)(2).

We note that the Court recently issued an Opinion in the case of Arevalo v. Commissioner, 124 T.C. 244 (2005). The facts in this case, relating to the investment in pay phones, are virtually identical to the facts in Arevalo. Thus, the Opinion in Arevalo is controlling.

## Background

Some of the facts have been stipulated, and they are so found. The stipulation of facts and the attached exhibits are

---

[1] The parties agree that petitioners were not entitled to a sec. 179 deduction for a candy box business petitioners operated during tax year 1999. The parties agree, however, that petitioners were entitled to a depreciation deduction of $1,549 for the candy box business in that same year.

incorporated by this reference.  Petitioners resided in Inverness, Florida, at the time the petition was filed.

On October 14, 1999, petitioners entered into a contract with ATC, Inc. (ATC), a wholly owned subsidiary of Alpha Telcom, Inc. (Alpha Telcom), entitled "Telephone Equipment Purchase Agreement" (ATC pay phone agreement).  Under the terms of the ATC pay phone agreement, petitioners paid $10,000 to ATC, and ATC provided petitioners with legal title to the "telephone equipment" that was purportedly described in an attachment to the ATC pay phone agreement, entitled "Telephone Equipment List".  The attachment, however, did not identify any pay phones subject to the agreement.  Only identification numbers, the location of the pay phones, and sale prices were provided.  The ATC pay phone agreement also included the following provision:

1.  Bill of Sale and Delivery

a.  Delivery by Seller shall be considered complete upon delivery of the Equipment to such place designated by Owner.

b.  Owner agrees to take delivery of installed Equipment and location on site.

c.  Upon delivery, Owner shall acquire all rights, title and interest in and to the Equipment purchased.

d.  Owner authorizes ATC to enter into such site agreement as may be deemed necessary to secure site.

e.  Phones have approved installation under The American with Disabilities Act.

The "Buy Back Election" to the Alpha Telcom Telephone Services Agreement (Alpha Telcom service agreement) stated:

> 1.0.  <u>Buy Back Election</u>:  Owner shall have the right to sell to Alpha Telcom, Inc. each payphone upon the following terms and conditions:  in the first six months between the for the buy back election, the sale[s] price shall be the Owner's original purchase price less $625; in months 7 through 12, it shall be the purchase price less $375; in months 13 through 24, it shall be the purchase price less $250[;] in months 25 through 36, it shall be the purchase price less $125; and after 36 months, it shall be the full purchase price.

An exhibit to the ATC pay phone agreement includes a list of service providers available to maintain the pay phones should petitioners not want to service the pay phones themselves. Petitioners also had the option to enter into a service agreement with Alpha Telcom (ATC, Inc. service selection form) if they did not want to be involved in the day-to-day maintenance of the pay phones.

Under the terms of the Alpha Telcom service agreement, Alpha Telcom agreed to service and maintain the pay phones for an initial term of 3 years in exchange for 70 percent of the pay phones' monthly adjusted gross revenue.  In the event that a pay phone's adjusted gross revenue was less than $58.34 for the month, Alpha Telcom would waive or reduce the 70-percent fee and pay petitioners at least $58.34, so long as the equipment generated at least that amount.  In the event that a pay phone's adjusted gross revenue was less than $58.34 for the month,

petitioners would receive 100 percent of the revenue. Notwithstanding the terms of the Alpha Telcom service agreement, Alpha Telcom made it a practice to pay $58.34 per month per pay phone, regardless of how little income the pay phone produced. Additionally, under the Alpha Telcom service agreement, Alpha Telcom negotiated the site agreement with the owner or leaseholder of the premises where the pay phones were to be installed. Alpha Telcom installed the pay phones, paid the insurance premiums on the pay phones, collected and accounted for the revenues generated by the pay phones, paid vendor commissions and fees, obtained all licenses needed to operate the pay phones, and took all actions necessary to keep the pay phones in working order. Petitioner Kenneth Dunn signed the Alpha Telcom service agreement and the ATC, Inc. service selection form on October 14, 1999,[2] the same day he signed the ATC pay phone agreement.

Petitioners received an undated letter confirming their pay phone order and a notice that an order had been placed for the installation of the pay phones. Petitioners were not able to select the pay phones that would be assigned to them. Petitioners, however, knew where the pay phones would be installed.

---

[2] Mr. Dunn, as trustee, signed on behalf of petitioners for the Kenneth R. Dunn & Delia H. Dunn Revocable Trust Agreement.

Sometime in 1999, petitioners received a flyer from an entity named Tax Audit Protection, Inc. The flyer provided information about Alpha Telcom pay phones. It stated that owners of Alpha Telcom pay phones qualified for tax credits for compliance with the Americans with Disabilities Act of 1990 (ADA), Pub. L. 101-336, 104 Stat. 327, and that "owners of Alpha Telcom payphones" could be eligible for tax credits of $2,500 per phone, up to $5,000 maximum, per year. The flyer identified a person named George Mariscal as the president of the company.

Alpha Telcom modified the pay phones to be accessible to the disabled: (1) By adjusting the cord length so that the pay phones would be accessible to the wheelchair bound, and/or (2) by installing volume controls to make them more useful to the hearing impaired, and/or (3) by reducing the height at which the pay phones were installed. Alpha Telcom represented to investors that the modifications made to the pay phones complied with ADA requirements. The ATC pay phone agreement states that "Phones have approved installation under The * * * (ADA)". The undated confirmation letter also states that "These phones qualify under the 1990 Americans with Disabilities Act, as amended". Petitioners were not provided with a list of the modifications that were made to the pay phones that were assigned to them, and they did not know the cost of these modifications.

On their 1999 Federal income tax return, petitioners claimed on Schedule C, Profit or Loss From Business, a $10,000 depreciation deduction and a section 179 expense deduction with respect to the pay phones.

Petitioners claimed a $4,772 tax credit, with respect to the pay phones, on Form 8826, Disabled Access Credit, that was attached to their 1999 Federal income tax return. For purposes of claiming this credit, petitioners reported that they had $10,000 of eligible access expenditures during 1999.

Alpha Telcom grew rapidly through its pay phone program but was poorly managed and ultimately operated at a loss. On August 24, 2001, Alpha Telcom filed for bankruptcy under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Florida. The matter was later transferred to the U.S. Bankruptcy Court for the District of Oregon on September 17, 2001. On November 20, 2001, petitioners filed a proof of claim in the bankruptcy court in the amount of $10,816.76, representing the $10,000 that they had invested, plus 7 months of payments at $58.34 per pay phone that they had not received from ATC as of the claim date. The bankruptcy matter was dismissed on September 10, 2003, by motion of Alpha Telcom. The bankruptcy court held that it was in the best interest of creditors and the estate to dismiss the bankruptcy matter so that proceedings could continue in Federal District Court, where there was a pending receivership

involving debtors.  The receivership was the result of a civil enforcement action brought by the Securities and Exchange Commission (SEC) against Alpha Telcom in 2001 in the U.S. District Court for the District of Oregon.  The District Court appointed a receiver in September 2001 to take over the operations of Alpha Telcom and to investigate its financial condition.  On February 7, 2002, the District Court held that the pay phone scheme was actually a security investment and that Federal law had been violated by Alpha Telcom because the program had not been registered with the SEC.  The U.S. Court of Appeals for the Ninth Circuit affirmed this decision on December 5, 2003.

Respondent disallowed the depreciation deduction petitioners claimed because "the telephones are located in a place that * * * [petitioners did] not own or operate as a trade or business" and "* * * [petitioners] did not have a depreciable interest in the payphone".  Respondent also disallowed the disabled access credit petitioners claimed because no business reason has been given or verified for petitioners to comply with the ADA.

Discussion

I.  <u>Burden of Proof</u>

Section 7491 is applicable to this case because the examination in connection with this action was commenced after July 22, 1998, the effective date of that section.  See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L.

105-206, sec. 3001(c)(1), 112 Stat. 727. Under section 7491, the burden of proof shifts from the taxpayer to the Commissioner if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's tax liability. Sec. 7491(a)(1). However, section 7491(a)(1) applies with respect to an issue only if the taxpayer has complied with the requirements under the Code to substantiate any item, has maintained all records required under the Code, and has cooperated with reasonable requests by the Commissioner for witnesses, information, documents, meetings, and interviews. See sec. 7491(a)(2)(A) and (B).

Petitioners have not argued that they have satisfied any of the criteria of section 7491(a)(1) or (2). In any event, the burden of proof does not play a role in the case before us, because there is no dispute as to a factual issue.

II.  Depreciation Deduction

As we indicated in Arevalo v. Commissioner, 124 T.C. at 251, depreciation deductions are based on an investment in and actual ownership of property rather than the possession of bare legal title.  "A taxpayer has received an interest in property that entitles the taxpayer to depreciation deductions only if the benefits and burdens of ownership with respect to the property have passed to the taxpayer."  Id. (and cases cited thereat).

In <u>Arevalo</u>, we discussed eight factors in considering the substance, rather than the labels, of the agreement between the taxpayer and the seller. Just as we concluded in <u>Arevalo</u>, we conclude here that the factors work against petitioners. Petitioners did not have control over or possession of the pay phones. Petitioners did not have the power to select the location of the pay phones or enter into site agreements with owners or leaseholders of the premises where the pay phones were to be located. There is no evidence that petitioners paid any property taxes, insurance premiums, or license fees. There was minimal risk because of the ability of petitioners to sell legal title to the pay phones back to ATC at a fixed formula price. Alpha Telcom was entitled, pursuant to the agreement, to receive most of the profits from the pay phones. At the time of the bankruptcy of Alpha Telcom, petitioners did not take possession of the pay phones or hire an alternative provider, but rather filed a claim in bankruptcy court for the price of the pay phones and monthly payments not received. All responsibilities for maintaining the pay phones and risks associated with the pay phones' producing insufficient revenues remained with Alpha Telcom. The transaction was more like a security investment than a sale, whereby petitioners made a one-time payment to ATC in return for an opportunity to receive a minimum annual return per pay phone and the tax benefits of "ownership".

For the identical reasons cited in Arevalo, we conclude that petitioners did not receive the benefits and burdens of ownership with respect to the pay phones. See id. at 253. Since petitioners did not receive a depreciable interest in the pay phones, they are not entitled to claim a depreciation deduction under section 167. See id.

III. ADA Tax Credit

In Arevalo, we discussed in some detail the interplay of the general business credit under section 38 and the disabled access credit under section 44(a). Id. at 254. We concluded that the taxpayer's investment in the pay phones did not constitute an eligible access expenditure and thus found it unnecessary to consider whether the taxpayer's pay phone activities constituted an eligible small business. Id. at 255. We explained that "In order for an expenditure to qualify as an eligible access expenditure within the meaning given that term by section 44(c), it must have been made to enable an eligible small business to comply with the applicable requirements under the ADA". Id. (and cases cited thereat).

We summarized in Arevalo as follows:

> any person who owns, leases, leases to, or operates a
> public accommodation is required to make modifications
> for disabled individuals in order to comply with the
> requirements set forth in ADA title III. While ADA
> title III does not define the terms "own", "lease",
> "lease to", or "operate", we must construe those terms
> in accord with their ordinary and natural meaning.
> See, e.g., Smith v. United States, 508 U.S. 223, 228

(1993); <u>Neff v. Am. Dairy Queen Corp.</u>, 58 F.3d 1063, 1066 (5th Cir. 1995) (construing the term "operate", as used in ADA title III, as follows:  "To 'operate,' in the context of a business operation, means 'to put or keep in operation,' 'to control or direct the functioning of,' 'to conduct the affairs of; manage,'" (citations omitted)).  [<u>Id.</u> at 256.]

Consistent with our conclusion in <u>Arevalo</u>, we conclude that petitioners did not own, lease, or operate anything as a result of their investment in the pay phones and were never under an obligation to comply with the requirements of ADA title III during the year in issue.  See <u>id.</u>  We further conclude, as we did in <u>Arevalo</u>, that petitioners were under no obligation to comply with ADA title IV during the year in issue, since petitioners were not actively engaged in the provision of services to anyone as a result of their investment in the pay phones.  See <u>id.</u> at 257 (and cases cited thereat).

IV.  <u>Loss</u>

Petitioners also raised the issue of whether they were entitled to claim a loss under section 165(c)(2).  In support of their claim, petitioners point to a letter they believed to have been written by someone at the Internal Revenue Service, wherein it is concluded that petitioners may be entitled to claim a loss in 2001.  Petitioners have not established that they incurred a loss in 1999, and we need not decide whether they incurred a loss in a year not before the Court.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered under Rule 155</u>.