T.C. Summary Opinion 2005-122

UNITED STATES TAX COURT

ARTHUR R. KOSKELA, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8129-04S.            Filed August 11, 2005.

Arthur R. Koskela, pro se.

Chris J. Sheldon, for respondent.

PANUTHOS, Chief Special Trial Judge:  This case was heard
pursuant to the provisions of section 7463 of the Internal
Revenue Code in effect when the petition was filed.  The decision
to be entered is not reviewable by any other court, and this
opinion should not be cited as authority.  Unless otherwise
indicated, all subsequent section references are to the Internal
Revenue Code in effect at relevant times.

Respondent determined deficiencies of $4,875, $4,875, and $1,514 in petitioner's Federal income taxes for the taxable years 2000, 2001, and 2002, respectively. The deficiencies were due to respondent's disallowance of a tax credit regarding petitioner's investment in pay telephones (pay phones) for each of the years in issue.

The sole issue for decision is whether petitioner is entitled to claim tax credits under section 44 for his investments in the pay phones for 2000, 2001, and 2002.

We note that the Court recently issued an Opinion in the case of <u>Arevalo v. Commissioner</u>, 124 T.C. 244 (2005). The facts in this case, relating to the investments in pay phones, are virtually identical to the facts in <u>Arevalo</u>. Thus, the Opinion in <u>Arevalo</u> is controlling.

Background

Some of the facts have been stipulated, and they are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. Petitioner resided in Phoenix, Arizona, at the time the petition was filed.

Petitioner entered into three separate contracts dated August 18, 2000, November 7, 2000, and January 2, 2001, with ATC, Inc. (ATC), a wholly owned subsidiary of Alpha Telcom, Inc. (Alpha Telcom), entitled "Telephone Equipment Purchase Agreement" (ATC pay phone agreements).

Under the terms of the ATC pay phone agreements, petitioner paid $5,000 per pay phone to ATC, and ATC provided petitioner with legal title to the "telephone equipment" that was purportedly described in an attachment to the ATC pay phone agreements, entitled "Telephone Equipment List". The attachment, however, did not identify any pay phones subject to the agreements. Only identification numbers, the locations of 2 of the 11 pay phones, and sale prices were provided. The ATC pay phone agreements also included the following provision:

1. Bill of Sale and Delivery

   a. Delivery by Seller shall be considered complete upon delivery of the Equipment to such place(s) as are designated by Owner.

   b. Owner agrees to take delivery of Equipment within (15) fifteen business days. If Seller has not delivered the equipment within (90) ninety days, Owner may terminate this Agreement upon Seller's receipt of signed notice from Purchaser.

   c. Upon delivery, Owner shall acquire all rights, title and interest in and to the Equipment purchased.

   d. Phones have approved installation under The American with Disabilities Act.

The "Buy Back Election" to the ATC pay phone agreements stated:

1.0. Buy Back Election: Should Owner elect to sell any telephone equipment, itemized in Exhibit "A", American Telecommunications Company, Inc., (hereinafter "Seller"), agrees to buy back such equipment from Owner, according to the following terms and conditions: 1) If exercise of the buy back election occurs in the first thirty-six months after the equipment delivery date, the re-sale price shall be the Owner's original purchase price of $5,000.00, minus a "restocking fee" of (10%) ten percent of the purchase price; 2) If the buy-back election is made more than (36) thirty-

six months after the equipment delivery date, the sale price shall be the Owner's original purchase price of $5,000.00, and there shall be no "restocking fee" for Purchaser's election to re-sell the equipment purchased back to Seller. This "Buy Back Election" shall expire on the (84th) eighty-fourth month anniversary of Owner's equipment delivery date. 3) Seller, or its designee, reserves the right of first refusal as to the telephone equipment. If Owner enters into an agreement to sell the telephone equipment to any third party, Seller, or its designee, shall have thirty (30) days to match any legitimate offer to purchase said equipment received by Owner.[1]

An exhibit to the ATC pay phone agreements includes a list of service providers available to maintain the pay phones should petitioner not want to service the pay phones himself. Petitioner had the option to enter into service agreements if he did not want to be involved in the day-to-day maintenance of the pay phones. Petitioner entered into service agreements with Alpha Telcom (Alpha Telcom service agreements) for the servicing of his pay phones. Petitioner never changed service providers, nor did he contact any other service provider to inquire about service options for his pay phones.

Under the terms of the Alpha Telcom service agreements, Alpha Telcom agreed to service and maintain the pay phones for an initial term of 3 years in exchange for 70 percent of the pay phones' monthly adjusted gross revenue. In the event that a pay phone's adjusted gross revenue was less than $58.34 for the month, Alpha Telcom would waive or reduce the 70-percent fee and

---

[1] There are minor variations in the terms of the buyback elections, none of which are material.

pay petitioner at least $58.34, so long as the equipment generated at least that amount. In the event that a pay phone's adjusted gross revenue was less than $58.34 for the month, petitioner would receive 100 percent of the revenue. Notwithstanding the terms of the Alpha Telcom service agreements, Alpha Telcom made it a practice to pay up to $58.34 per month per pay phone, regardless of how little income the pay phones produced. Additionally, under the Alpha Telcom service agreements, Alpha Telcom negotiated the site agreement with the owner or leaseholder of the premises where the pay phones were to be installed. Alpha Telcom installed the pay phones, paid the insurance premiums on the pay phones, collected and accounted for the revenues generated by the pay phones, paid vendor commissions and fees, obtained all licenses needed to operate the pay phones, and took all actions necessary to keep the pay phones in working order.

ATC sent petitioner an undated Payphone Purchase & Installation Confirmation document to confirm the order and installation of the pay phone for the August 18, 2000, contract. Petitioner received letters (dated November 7, 2000, and January 10, 2001) to confirm the order and installation of the pay phones for the November 7, 2000, and January 5, 2001, contracts. Petitioner was not able to select the pay phones that would be

randomly assigned to him. Petitioner does not know where all of the pay phones assigned to him were located.

Sometime around August 2000, an ATC/Alpha Telcom sales representative gave petitioner a flyer from an entity named Tax Audit Protection, Inc. The flyer provided information about Alpha Telcom pay phones. It stated that owners of Alpha Telcom pay phones qualified for tax credits for compliance with the Americans with Disabilities Act of 1990 (ADA), Pub. L. 101-336, 104 Stat. 327, and that "owners of Alpha Telcom payphones" could be eligible for tax credits of $2,500 per phone, up to $5,000 maximum, per year. The flyer identified a person named George Mariscal as the president of the company.

Alpha Telcom modified the pay phones to be accessible to the disabled: (1) By adjusting the cord length so that the pay phones would be accessible to the wheelchair bound, and/or (2) by installing volume controls to make them more useful to the hearing impaired, and/or (3) by reducing the height at which the pay phones were installed. Alpha Telcom represented to investors that the modifications made to the pay phones complied with ADA requirements. The ATC pay phone agreements state that "Phones have approved installation under The * * * (ADA)". The confirmation letters also state that "These phones qualify under the 1990 Americans with Disabilities Act, as amended". Petitioner was not provided with a list of the modifications that

were made to the pay phones that were assigned to him, and he did not know the cost of these modifications.

Petitioner claimed a $4,875 tax credit for 2000, a $4,875 tax credit for 2001, and a $2,375 tax credit for 2002 on Forms 8826, Disabled Access Credit, with respect to the pay phones, that were attached to his Federal income tax returns for the years in issue.

Alpha Telcom grew rapidly through its pay phone program but was poorly managed and ultimately operated at a loss. On August 24, 2001, Alpha Telcom filed for bankruptcy under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Florida. The matter was later transferred to the U.S. Bankruptcy Court for the District of Oregon on September 17, 2001. On July 26, 2002, petitioner filed a proof of claim in the bankruptcy court in the amount of $90,000, representing the $90,000 that he had invested.[2] The bankruptcy matter was dismissed on September 10, 2003, by motion of Alpha Telcom. The bankruptcy court held that it was in the best interest of creditors and the estate to dismiss the bankruptcy matter so that proceedings could continue in Federal District Court, where there

---

[2] Petitioner's $90,000 payment represented the amount he paid for a total of 18 pay phones. Petitioner purchased 7 pay phones from ATC, in addition to the 11 pay phones petitioner had previously purchased from ATC. Petitioner did not claim a sec. 44 credit for the additional 7 pay phones. Those pay phones are not before the Court.

was a pending receivership involving debtors.    The receivership
was the result of a civil enforcement action brought by the
Securities and Exchange Commission (SEC) against Alpha Telcom in
2001 in the U.S. District Court for the District of Oregon.  The
District Court appointed a receiver in September 2001 to take
over the operations of Alpha Telcom and to investigate its
financial condition.  On February 7, 2002, the District Court
held that the pay phone scheme was actually a security investment
and that Federal law had been violated by Alpha Telcom because
the program had not been registered with the SEC.  The U.S. Court
of Appeals for the Ninth Circuit affirmed this decision on
December 5, 2003.

Respondent disallowed the disabled access credits petitioner
claimed because "no business reason, to comply with the Americans
With Disabilities Act of 1990, has been given and verified to
claim the credit".

## Discussion

### I.   Burden of Proof

Section 7491 is applicable to this case because the
examination in connection with this action was commenced after
July 22, 1998, the effective date of that section.  See Internal
Revenue Service Restructuring and Reform Act of 1998, Pub. L.
105-206, sec. 3001(c)(1), 112 Stat. 727.  Under section 7491, the
burden of proof shifts from the taxpayer to the Commissioner if

the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's tax liability. Sec. 7491(a)(1).

Petitioner has not argued that he has satisfied any of the criteria of section 7491(a)(1) or (2). In any event, the burden of proof does not play a role in the case before us, because there is no dispute as to a factual issue.

II. ADA Tax Credit

In Arevalo v. Commissioner, 124 T.C. at 254, we discussed in some detail the interplay of the general business credit under section 38 and the disabled access credit under section 44(a). We concluded that the taxpayer's investment in the pay phones did not constitute an eligible access expenditure and thus found it unnecessary to consider whether the taxpayer's pay phone activities constituted an eligible small business. Id. at 255. We explained that "In order for an expenditure to qualify as an eligible access expenditure within the meaning given that term by section 44(c), it must have been made to enable an eligible small business to comply with the applicable requirements under the ADA". Id. (and cited cases thereat).

We summarized in Arevalo as follows:

> any person who owns, leases, leases to, or operates a
> public accommodation is required to make modifications
> for disabled individuals in order to comply with the
> requirements set forth in ADA title III. While ADA
> title III does not define the terms "own", "lease",
> "lease to", or "operate", we must construe those terms

in accord with their ordinary and natural meaning. See, e.g., <u>Smith v. United States</u>, 508 U.S. 223, 228 (1993); <u>Neff v. Am. Dairy Queen Corp.</u>, 58 F.3d 1063, 1066 (5th Cir. 1995) (construing the term "operate", as used in ADA title III, as follows:  "To 'operate,' in the context of a business operation, means 'to put or keep in operation,' 'to control or direct the functioning of,' 'to conduct the affairs of; manage,'" (citations omitted)).  [<u>Id.</u> at 256.]

Consistent with our conclusion in <u>Arevalo</u>, we conclude that petitioner did not own, lease, or operate anything as a result of his investments in the pay phones and was never under an obligation to comply with the requirements of ADA title III during the years in issue.  See <u>id.</u>  We further conclude, as we did in <u>Arevalo</u>, that petitioner was under no obligation to comply with ADA title IV during the years in issue, since petitioner was not actively engaged in the provision of services to anyone as a result of his investments in the pay phones.  See <u>id.</u> at 257 (and cases cited threat).  Respondent is sustained on this issue.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.