T.C. Summary Opinion 2007-149


UNITED STATES TAX COURT


EDWARD ATLEE HOWES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 262-04S.               Filed August 29, 2007.


Edward Atlee Howes, pro se.

<u>Julia L. Wahl</u>, for respondent.


ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect when the petition was filed.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by any

_____

[1]  Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined deficiencies in petitioner's Federal income taxes for 1999, 2000, and 2001 of $5,154, $3,356, and $3,252, respectively. The deficiencies stem generally from the disallowance of depreciation deductions under section 167 and the disallowance of disabled access credits under section 44. On June 21, 2007, after the parties had filed a comprehensive stipulation of facts, this Court issued an Order to Show Cause why respondent's determination as to the denial of the depreciation deductions and the disabled access credits should not be sustained. For the reasons discussed below, we now make that Order absolute.

## Background

### A. Procedural History

This case, commenced in January 2004, has been continued for trial on three separate occasions because of the pendency of related litigation (sometimes referred to herein as the Alpha Telcom cases). The related litigation has now been concluded, and the decisions entered in those cases have become final. In every instance, the Court has sustained the Commissioner's deficiency determination, and in each of the cases in which the taxpayer appealed, a U.S. Court of Appeals has affirmed the decision of this Court. See Arevalo v. Commissioner, 124 T.C.

244 (2005), affd. 469 F.3d 436 (5th Cir. 2006); <u>Crooks v. Commissioner</u>, 453 F.3d 653 (6th Cir. 2006). No court has held to the contrary. In short, this Court and the Courts of Appeals have consistently held that a taxpayer's investment in an arrangement involving pay telephones marketed by Alpha Telcom, Inc. (Alpha Telcom) and its wholly owned subsidiary American Telecommunications Co., Inc. (ATC) did not support either (1) a deduction for depreciation, because the taxpayer did not have the requisite benefits and burdens of ownership to support a depreciable interest in the pay telephones, or (2) a disabled access credit under section 44, because such investment was not an eligible access expenditure.

On September 20, 2004, the parties in the instant case filed a comprehensive Stipulation Of Facts consisting of 33 numbered paragraphs and 31 exhibits. The Stipulation Of Facts and accompanying exhibits provide an evidentiary record for this case, discussed more fully below, that does not materially differ from the facts presented in the Alpha Telcom cases already decided by this Court and the Courts of Appeal. Therefore, on June 21, 2007, we ordered the parties to show cause in writing why the Court should not enter a decision sustaining respondent's determination as to (1) the denial of deductions for depreciation on the telephones, and (2) the denial of disabled access credits

under section 44, both pursuant to <u>Arevalo v. Commissioner</u>, <u>supra</u>, and other relevant case law.

Petitioner submitted a response to our Order completely devoid of any factual analysis; it contained only irrelevant statements and naked, unsupported assertions that his case is somehow different from all of the other Alpha Telcom cases.  Such a response is insufficient to persuade us that the Order should not be made absolute.  See Rule 121(d) (requiring that a party must present specific facts showing that there is a genuine issue for trial in the summary judgment context).

B.  The Stipulated Facts

The following facts have been stipulated, and they are so found; we incorporate by reference the parties' stipulation of facts and accompanying exhibits.

At the time the petition was filed, Edward Atlee Howes (petitioner) resided in Naples, Florida.

On March 2, 1999, petitioner entered into a contract with ATC, a wholly owned subsidiary of Alpha Telcom, entitled "Telephone Equipment Purchase Agreement" (ATC pay telephone agreement).[2]  Under the terms of the ATC pay telephone agreement, petitioner paid $10,000 to ATC, and ATC provided petitioner with

---

[2]  In the exhibits attached to the Stipulation Of Facts, ATC sometimes refers to American Telecommunications, Inc., and sometimes to Alpha Telcom.

legal title to two pay telephones.  The ATC pay telephone agreement also included the following provision:

    1.  Bill of Sale and Delivery

        a.  Delivery by Seller shall be considered complete upon delivery of the Equipment to such place designated by Owner.

        b.  Owner agrees to take delivery of installed Equipment and location on site.

        c.  Upon delivery, Owner shall acquire all rights, title and interest in and to the Equipment purchased.

        d.  Owner authorizes ATC to enter into such site agreement as may be deemed necessary to secure site.

        e.  Phones have approved installation under The American [sic] with Disabilities Act. (ADA)

On the same day, petitioner entered into a Telephone Services Agreement (Alpha Telcom service agreement) under which petitioner agreed that Alpha Telcom would manage the two pay telephones.  Because petitioner did not feel able to maintain the telephones himself, he elected "Level IIII" [sic] service.  This election meant that Alpha Telcom agreed to service and maintain the pay telephones for an initial term of 3 years in exchange for 70 percent of the pay telephones' monthly adjusted gross revenue. In the event that a pay telephone's adjusted gross revenue was less than $58.34 for the month, Alpha Telcom would waive or reduce the 70-percent fee and pay petitioner at least $58.34, so long as the equipment generated at least that amount.  In the event that a pay telephone's adjusted gross revenue was less than

$58.34 for the month, petitioner would receive 100 percent of the revenue. Notwithstanding this formula, Alpha Telcom made it a practice to pay $58.34 per telephone, regardless of the income actually produced.

Additionally, Alpha Telcom agreed to be bound by the "Buy Back Election" to the Alpha Telcom service agreement. The "Buy Back Election" stated:

> 1.0. Buy Back Election: Owner shall have the right to sell to Alpha Telcom, Inc. each payphone upon the following terms and conditions: in the first six months between the equipment delivery date and the exercise date for the buy back election, the sale price shall be the Owner's original purchase price less $625; in months 7 through 12, it shall be the purchase price less $375; in months 13 through 24, it shall be the purchase price less $250[;] in months 25 through 36, it shall be the purchase price less $125; and after 36 months, it shall be the full purchase price.

Under the Alpha Telcom service agreement, Alpha Telcom negotiated the site agreement with the owner or leaseholder of the premises where the pay telephones were to be installed.[3] Alpha Telcom installed the telephones, paid the insurance premiums on them, collected and accounted for the revenues generated by the telephones, paid vendor commissions and fees,

---

[3] At some point, ATC sent petitioner an undated letter, informing him that one of the telephones assigned to him and located at a business called Art's Cafe had been replaced with one located at a Black Angus restaurant. Petitioner had no affiliation with either Art's Café or Black Angus. Petitioner did not initiate this change, and it was made without his prior knowledge or assent.

obtained all licenses needed to operate the telephones, and took all actions necessary to keep the telephones in working order.

On December 29, 2000, petitioner entered into a second "Telephone Equipment Purchase Agreement" contract with ATC, ostensibly purchasing two more telephones for $5,000 each.[4]  He again signed a services agreement and selected the "Level 4" service.  Again, Alpha Telcom was responsible for all maintenance, and petitioner was to receive $58.34 per month, per telephone.  Petitioner was later informed that these two pay telephones were placed at an amateur baseball field in West Warwick, Rhode Island.  As was true with all of the pay telephones assigned to petitioner under this scheme, Alpha Telcom negotiated for the placement of the telephones, and petitioner was not involved in any way with those negotiations.

Alpha Telcom modified the pay telephones to be accessible to the disabled:  (1) By adjusting the cord length so that the telephones would be accessible to the wheelchair bound, and/or (2) by installing volume controls to make them more useful to the hearing impaired, and/or (3) by reducing the height at which the telephones were installed.  Alpha Telcom represented to investors

---

[4]  The Telephone Equipment Bill of Sale and Purchase Agreement was left blank; it did not actually identify in any way the telephones that would be assigned to petitioner. Additionally, though the Buy Back Election was slightly modified from its earlier form, it still provided for a repurchase price of $5,000 per telephone.

that the modifications made to the pay telephones complied with the requirements of the Americans with Disabilities Act of 1990 (ADA), Pub. L. 101-336, 104 Stat. 327.[5]  Petitioner was not provided with a list of the modifications that were made to the pay telephones assigned to him, and he did not know the cost of these modifications.

Petitioner received monthly payments of $58.34 per telephone in 1999 and 2000 from Alpha Telcom.[6]

Alpha Telcom grew rapidly through its pay telephone program but was poorly managed and ultimately operated at a loss.  On August 24, 2001, Alpha Telcom filed for bankruptcy under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Florida.  The matter was later transferred to the U.S. Bankruptcy Court for the District of Oregon on September 17, 2001.  On February 25, 2002, petitioner filed a proof of claim with the bankruptcy court.[7]

---

[5]  Aside from Alpha Telcom's own representations, petitioner received a flyer from an entity named Tax Audit Protection, Inc. The flyer provided information about Alpha Telcom pay telephones. It stated that owners of Alpha Telcom pay telephones qualified for tax credits for compliance with the ADA.  The flyer identified a person named George Mariscal as the president of the company.

[6]  The payments in 1999 were prorated according to when Alpha Telcom installed the telephones.

[7]  The bankruptcy matter was dismissed on Sept. 10, 2003, by motion of Alpha Telcom.  The bankruptcy court held that it was in the best interest of creditors and the estate to dismiss the

(continued...)

The Securities and Exchange Commission brought a civil suit against Alpha Telcom in 2001, alleging that the pay telephone scheme was a security and that the company was in violation of Federal securities law; the decision was affirmed by the U.S. Court of Appeals for the Ninth Circuit in 2003.  See <u>SEC v. Rubera</u>, 350 F.3d 1084, 1087 (9th Cir. 2003).

In the notice of deficiency that gave rise to the instant case, respondent disallowed the depreciation deductions petitioner claimed because petitioner did not have a depreciable interest in the telephones.  Respondent also disallowed the disabled access credits petitioner claimed because petitioner had not demonstrated that he was in a trade or business, that the expenses were reasonable, or that the expenses were enabling a business to comply with the ADA.

Discussion

A.  <u>Depreciation Deductions</u>

Section 167(a) allows as a depreciation deduction a reasonable allowance for the "exhaustion, wear and tear" of property (1) used in a trade or business or (2) held for the production of income.  Sec. 167(a)(1) and (2).

---

[7](...continued)
bankruptcy matter so that proceedings could continue in Federal District Court, where there was a pending receivership involving debtors.

Depreciation deductions are based on an investment in and actual ownership of property rather than the possession of bare legal title.  See <u>Arevalo v. Commissioner</u>, 124 T.C. at 251; <u>Grant Creek Water Works, Ltd. v. Commissioner</u>, 91 T.C. 322, 326 (1988); <u>Narver v. Commissioner</u>, 75 T.C. 53, 98 (1980), affd. 670 F.2d 855 (9th Cir. 1982).  "The Supreme Court has repeatedly stressed that, in examining transactions for the purpose of determining their tax consequences, substance governs over form."  <u>Arevalo v. Commissioner</u>, 469 F.3d at 439; see also <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 572-573 (1978); <u>Grodt & McKay Realty, Inc. v. Commissioner</u>, 77 T.C. 1221, 1236 (1981).

If the benefits and burdens reflecting ownership have not passed from "seller" to "purchaser", we disregard the transfer of formal legal title when determining ownership of an asset for tax purposes.  See <u>Arevalo v. Commissioner</u>, 469 F.3d at 439.  In other words, when a taxpayer never actually owns the property in question, the taxpayer is not allowed to claim a deduction for depreciation.  See <u>Arevalo v. Commissioner</u>, 124 T.C. at 251; <u>Grodt & McKay Realty, Inc. v. Commissioner</u>, <u>supra</u> at 1236-1238; see also <u>Schwartz v. Commissioner</u>, T.C. Memo. 1994-320, affd. without published opinion 80 F.3d 558 (D.C. Cir. 1996).  Whether the benefits and burdens of ownership with respect to property have passed to the taxpayer is a question of fact that must be ascertained from the intention of the parties as established by the written agreements read in light of the attending facts and

circumstances. See Arevalo v. Commissioner, 124 T.C. at 251-252; Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237.

The denial of depreciation deductions in the other Alpha Telcom cases has routinely been supported by the examination of eight factors: (1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property, and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation and disposition of the property. See, e.g., Arevalo v. Commissioner, 469 F.3d at 439-440; Crooks v. Commissioner, 453 F.3d at 656. Just as we concluded in Arevalo and Crooks, we conclude here that the factors clearly work against petitioner and no depreciation deduction is warranted.

The stipulation of facts and accompanying documents reveal that here, as in the related litigation, Alpha Telcom was responsible for the installation, location selection, site negotiation, and maintenance of the pay telephones. Alpha Telcom bore the risk of loss if the telephones did not generate sufficient revenue because petitioner was guaranteed to be paid at least $58.34 per month per pay telephone, regardless of the revenues actually generated, and it was Alpha Telcom who received the majority of any profit from the telephones. Further limiting

petitioner's risk of loss was the combination of the ATC pay telephone agreement and the Alpha Telcom service agreement, allowing petitioner to sell legal title to the telephones back to ATC for a fixed formula price.

Because petitioner never owned a depreciable interest in the pay telephones, he is not entitled to claim depreciation deductions under section 167 with respect to them.  See Crooks v. Commissioner, supra; Arevalo v. Commissioner, supra.

B.  ADA Tax Credits

For purposes of the general business credit under section 38, section 44(a) provides a disabled access credit for certain small businesses.  The amount of this credit is equal to 50 percent of the "eligible access expenditures" of an "eligible small business" that exceed $250 but that do not exceed $10,250 for the year.  Sec. 44(a).

In order to claim the disabled access credit, a taxpayer must demonstrate:  (1) the taxpayer is an "eligible small business" for the year in which the credit is claimed and, (2) the taxpayer has made "eligible access expenditures" during that year.  If the taxpayer cannot fulfill both of these requirements, the taxpayer is not eligible to claim the credit for that year.

For purposes of section 44, the term "eligible small business" is defined as any person who:  (1) had gross receipts of no more than $1 million for the preceding year or not more than 30 full-time employees during the preceding year and (2)

elects the application of section 44 for the year. Sec. 44(b). The term "eligible access expenditure" is defined as an amount paid or incurred by an eligible small business for the purpose of enabling the eligible small business to comply with the applicable requirements under the ADA. Sec. 44(c)(1). Such expenditures include amounts paid or incurred (1) for the purpose of removing architectural, communication, physical, or transportation barriers that prevent a business from being accessible to, or usable by, individuals with disabilities; (2) to provide qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments; (3) to acquire or modify equipment or devices for individuals with disabilities; or (4) to provide other similar services, modifications, materials, or equipment. See sec. 44(c)(2). However, eligible access expenditures do not include expenditures that are unnecessary to accomplish such purposes. See sec. 44(c)(3). Additionally, eligible access expenditures do not include amounts that are paid or incurred for the purpose of removing architectural, communication, physical, or transportation barriers that prevent a business from being accessible to, or usable by, individuals with disabilities with respect to any facility first placed in service after November 5, 1990. See sec. 44(c)(4).

In order for an expenditure to qualify as an eligible access expenditure within the meaning given that term by section 44(c),

it must have been made to enable an eligible small business to comply with the applicable requirements under the ADA.  See Arevalo v. Commissioner, 124 T.C. at 255; Fan v. Commissioner, 117 T.C. 32, 38-39 (2001).  Consequently, a person who does not have an obligation to become compliant with the requirements set forth in the ADA could never make an eligible access expenditure.  Petitioner, like the taxpayers in the other Alpha Telcom cases, had no obligation to become compliant with the ADA.

As relevant here, the requirements set forth in the ADA apply only to (1) persons who own, lease, lease to, or operate certain "public accommodations" and (2) "common carriers" of telephone voice transmission services.  See 42 U.S.C. sec. 12182(a) (2000); see also 47 U.S.C. sec. 225(c) (2000).  Petitioner did not own, lease, lease to, or operate a public accommodation during the taxable years at issue, nor was he a "common carrier" of telephone voice transmission services during those years.  Accordingly, petitioner was under no obligation to become compliant with the requirements set forth in the ADA.  See 42 U.S.C. sec. 12182(b)(2)(A)(ii) and (iii); 47 U.S.C. sec. 153(10); 47 U.S.C. sec. 225(a)(1) and (c).  Because petitioner did not own the pay telephones in which he invested and had no involvement in their operation, petitioner was not actively engaged in the provision of services to anyone as a result of his investment in the pay telephones.  Therefore, petitioner's investments in the telephones were not eligible access

expenditures, and petitioner is not entitled to claim the disabled access credit under section 44 for his investments in the telephones.

To reflect our disposition of the disputed issues and to make our Order to Show Cause absolute, as well as for such other proceedings as may be necessary,

<u>An appropriate order</u>

<u>will be issued.</u>