T.C. Memo. 2019-17

UNITED STATES TAX COURT

DAVID F. BURBACH, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

BURBACH AQUATICS, INC., Petitioner v. COMMISSIONER OF INTERNAL
REVENUE, Respondent

Docket Nos. 12021-12, 12762-12.　　　　　Filed March 7, 2019.

Curtis D. Smith and Yuri B. Berndt, for petitioners.

Christina L. Cook, Debra K. Moe, Vicki L. Miller, and John C. Schmittdiel,
for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge: *"Ya got trouble, folks, right here in River City*
　　　　　　　　　*Trouble with a capital 'T'*
　　　　　　　　　*And that rhymes with 'P'*
　　　　　　　　　*And that stands for Pool!"*[1]

---

[1] Meredith Willson, "Ya Got Trouble," The Music Man (1957).

**[\*2]** For most Americans, the Upper Midwest doesn't evoke images of beach balls and melting popsicles on hot sand, but that didn't stop David Burbach from building a successful pool-design company there. His thriving business was swimming right along for 25 years as a sole proprietorship until he met the late George T. Eldridge, an enrolled agent (or so Eldridge claimed) from Mango, Florida. Soon after, Burbach split his assets into three different corporations and stopped filing tax returns. This caused him trouble with a capital "T". He's done quite a bit since then to clean up his tax problems and blames Eldridge for the ones that persist.

The Commissioner is more skeptical than Marian the Librarian, and way less forgiving: He wants us to find Burbach and his operating company, Burbach Aquatics, Inc. (BAI), liable for a large tax bill and penalties.

FINDINGS OF FACT

A.    <u>David Burbach, Pool Designer</u>

David Burbach graduated in 1973 from the University of Wisconsin at Platteville with a bachelor's degree in engineering, and he has since become a licensed professional engineer in all nine states where BAI does business.[2] He

---

[2] Those are Wisconsin, Minnesota, Illinois, Missouri, Iowa, Nebraska, South Dakota, Wyoming, and Oklahoma.

**[*3]** added to those qualifications practical experience as a land surveyor, a licensed residential and commercial building inspector, and a soil morphologist--a soil scientist "trained to visually classify soils and observe the different characteristics of the soils and their behavior under certain conditions and certain loads." This skill stack is unusual and led Burbach to great success in an unusual niche in the economy.

It all started right after college when Burbach landed his first job with a Chicago suburb, where he worked for the city manager. That city manager learned of Burbach's skills and volunteered him to design several local pools. Before long Burbach went out on his own as a consultant. He started his business in 1978 as a sole proprietorship called D.F. Burbach Municipal and Civil Engineers. The business changed its name a few times between 1978 and 2001--from D.F. Burbach Municipal and Civil Engineers to Burbach Municipal and Civil Engineers to Burbach Aquatics, LLC (BA, LLC)--but continued to be treated as a sole proprietorship for tax purposes,[3] and its line of work remained the same.

---

[3] Burbach testified that BA, LLC was taxed as a sole proprietorship, from which we infer that it was a disregarded entity. See secs. 301.7701-2(a), 301.7701-3(b)(1)(ii), Proced. & Admin. Regs. That means that Burbach was taxed as a sole proprietor under the Internal Revenue Code on any income or loss of BA, LLC reported on his returns. See sec. 301.7701-2(a), Proced. & Admin. Regs. (All section references are to the Internal Revenue Code and regulations in effect

(continued...)

[*4]  Burbach's firm specializes in designing municipal pools and aquatic facilities,[4] but it does much more.  The firm's "pre-design services," according to Burbach, are "the reason why a lot of cities hire" it.  It helps small cities and towns in the Midwest form committees to evaluate their need for a pool, plans and markets the pool after their need for one is identified, and even helps with fundraisers to finance the pool.  This is a good business, and Burbach is good at it.  Over a three-year period, his business helped municipalities raise more than $8.5 million to fund pools, and over the entire course of his business Burbach has been successful in campaigning for nearly 30 municipal-bond referenda.  Burbach's business creates a demand for its product and then deftly supplies it; and demand has been, and remains, strong.[5]

With great success in construction comes great exposure to liability, and Burbach said that is why he started looking for advice about asset protection.  He

---

[3](...continued)
for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.)

[4] Burbach's business doesn't construct the pools it designs, but it does serve as project manager--"perform[ing] on-site observations, inspections and special inspections that are required by code and * * * company policies * * * [and] represent[ing] the interest of the municipal corporations."

[5] At the time of trial, Burbach had designed more than 600 municipal pools, and his business had more than 90 cities under contract.

[*5] specifically remembered the horrible Kansas City skywalk collapse in 1981 as an example of a liability where tremendous loss of life and damage led to tremendous lawsuits against the designers. Burbach also had some time to contemplate design problems closer to his field: Over the years he developed a small sideline as an expert witness and has testified in litigation bubbling up from a dozen major pool failures, though he carefully noted that he's "had zero failures in any pool that [he's] designed." He became convinced that an LLC wouldn't sufficiently limit his liability if there was some disaster with one of his pools, so he reached out to a local lawyer to talk about asset protection. That lawyer referred him to others in another town in Wisconsin, but Burbach said he "was not impressed with their knowledge at all." And, after that, he wasn't exactly heartened when he was referred to a tax preparer who had "fled town because of a drug issue." Burbach's search for a new adviser was not going well. It was then that a close friend threw him a life preserver: a "specialist [who] was very good at establishing * * * entities." That specialist was George T. Eldridge.

**[*6]** B.     George T. Eldridge, Enrolled Agent

George T. Eldridge had a Florida firm named A-1 Accountants, Inc. Eldridge identified himself as an accountant and enrolled agent.[6] Burbach didn't dive right into a professional relationship with Eldridge but instead tested the waters with a few phone calls. "I wanted to talk to him a little bit about * * * limiting my liability," Burbach maintained at trial, and "I wanted to establish some type of entity to do that." Over the course of three or four phone calls, Eldridge won Burbach's confidence.

Burbach sent Eldridge a letter in September 2001 in which he outlined the things he wanted to focus on, including asset protection but also--and more importantly here--structures to limit tax. Eldridge got to work and, after a few more phone calls, proposed a reorganization of Burbach's assets into "an engineering corporation, a real estate corporation, [and] then possibly creating a foundation." Burbach confirmed this proposed plan by letter in December 2001, but it would be months before it was completed. In the meantime, Burbach made his first trip to Florida to meet Eldridge.

---

[6] An enrolled agent is a regular person (i.e., neither a lawyer nor a CPA) who--by passing the Special Enrollment Examination--is allowed to represent taxpayers before the Internal Revenue Service.

**[*7]**  Burbach traveled to Florida in April 2002 to attend a class that Eldridge put on for him and another client--a class that Burbach says was about corporations, trusts, pension plans, and private foundations.  Burbach paid Eldridge $1,200 for this class.  He took three pages of notes during the two days he was there--notes primarily about pension plans--but we find Eldridge's class handout of much more interest.  Here are just a few noteworthy quotes:

- "Nevada is * * * the only state without a reciprocal information-sharing agreement with the I.R.S."

- "WHAT DOES [sic] THE BRITISH SAY? * * *  [T]he subject, whether poor and humble or wealthy and noble, has the legal right so to dispose of his capital and income as to attract upon himself the least amount of tax."

- "Protect your assets from lawsuits. * * *  Don't have the name of the corporation on deeds, titles, or other legal conveyances."

- "You Must Apply Rule of Law on a Daily Basis!  After all, you are not working for the IRS, or the 445 legal thieves in Washington, DC.  They will legally take your money.  They will then redistribute it to those individuals who will not work as you have worked.  Will you use RULE OF LAW and stop the 445 legal thieves?"[7]

- "A 'C' corporation taxpayer wishes to take aggressive positions on business expense deductions.  The 'C' corporation form offers a higher degree of probability that such deductions will avoid or survive an audit."

---

[7] This number is a mystery, though it might be a mistaken reference to the 435 members of the U.S. House of Representatives.

**[*8]** ● "If you have a defined benefit pension plan, you are entitled to an annual pension when you retire. The benefits are typically based on a formula that considers that you are self-employed as a board member."

● "HOW YOU THINK IS EVERYTHING. Always be positive. Think success, not failure. Beware of a negative environment. * * * DON'T BE AFRAID TO INNOVATE; BE DIFFERENT [sic] MONEY WORKING FOR YOU. Following the herd and negative people is a sure way to mediocrity."

● "Taxpayers & turtles have something in common. They both have to stick their necks out to get ahead."

● "Are you a Beleaguered American Taxpayer? Is the Grizzly Bear {the IRS} feasting sumptuously in [sic] your money that you have earned by work? * * * Are you ever going to use Rule of Law to stop paying maximum taxes to the Grizzly Bear? Do you have the heart to use Rule of Law through me? * * * What is your decision?"

The handout's overall theme is tax avoidance, but it sinks repeatedly into sheer incoherence.

Burbach didn't balk. After the class, Burbach and Eldridge met to go over Burbach's 2000 tax return, a return on which he had reported an almost $400,000 tax liability. Eldridge's thoughts: "You & the IRS definitely have an intimate daily love relationship.!!!" But Eldridge said he could fix that, and he proposed to do it for the low, low fee of over $12,000 per month.[8] In exchange for his fee,

---

[8] Eldridge calculated his fee by hand on a piece of notebook paper. He determined his monthly fee by taking 39% of Burbach's 2000 tax liability and

(continued...)

[*9] Eldridge agreed to form the entities necessary to effect Burbach's reorganization, transfer real estate, establish a pension plan and private foundation, "[a]nd then he would also prepare the taxes for all the different entities, * * * all the filings and all that stuff that has to be done."[9]

C.      New Entities and Tax Planning

In August 2002 Eldridge helped Burbach dissolve BA, LLC. He then formed BAI, Grant County Real Estate Services, Inc. (GCI), BA Enterprises, Inc. (BAE), and Blue Foundation, Inc. (BFI). We'll discuss each.

*BAI.* BAI is a corporation that Burbach wholly owns and formed to hold his operating business. Burbach is BAI's president, and he transferred into BAI "office equipment, things of that nature" and the cars and trucks he says BAI needed for its business.

*GCI.* GCI is also a corporation that Burbach wholly owns. It holds Burbach's real estate, and he seems to have transferred some farmland that he

---

[8](...continued)
dividing it by 12. There was also a one-time review fee of over $12,000 to be paid before the monthly payments started.

[9] Burbach and Eldridge never had a written agreement, but Burbach testified about the gist of their oral agreement.

**[*10]** owned, the buildings used by BFI, the office building used by BAI, and even his personal residence to this corporation.

*BAE.* BAE is another corporation that Burbach wholly owns. He doesn't know why it was formed, and it is wholly inactive.

*BFI.* BFI is a nonprofit corporation. Burbach owns it and "would place [his] Ford products collection into" it. Burbach is a collector of all things Ford, and he transferred lots of his collection to BFI, including about 40 cars, trucks, and tractors; some Ford satellites and Ford Philco televisions; and "several hundred pieces of farm equipment and * * * some limited construction equipment." BFI stored this Ford stuff in four large buildings on farmland owned by GCI.

Burbach stated that "he intended to create a museum showing the history of Ford equipment," but one might doubt his sincerity if one contemplates other things in the record--not the least of which is a note that Burbach jotted down at another one of Eldridge's classes in August 2004. The note says the "museum" would be open only from "8:[00] AM to 10:[00] AM weather permitting" and only in the "summer months." What's more, according to the note, he'd planned to advertise the museum's hours only by notice in *one* motel and backdated to November 2002. As best we can tell, BFI was a tentative tax dodge to enable

**[*11]** Burbach to take large deductions by contributing his Ford collection to a "charitable" entity that he controlled. In the end, the IRS never granted BFI a tax exemption under section 501(c)(3), and Burbach does not challenge the Commissioner's disallowance of all the charitable deductions that he claimed.

Eldridge didn't stop with the new entities; he also helped Burbach set up a pension plan. Burbach says he wanted a pension plan for the employees of BAI but, once again, other parts of the record make us doubt his testimony. The handout from Eldridge's April 2002 class described precisely how Burbach's pension plan would work:

- pension "benefits are typically based on a formula that considers that you are self-employed as a board member [i.e., director];"

- the "corporation pays each director," and it "must give each director at the end of each calendar year a 1099 MISC INCOME;"

- "[e]ach director must establish a defined benefit pension plan;" and

- "[a]fter having deposited the corporation check into his own personal checking account, the director from his own personal checking account writes a check to his own defined benefit pension plan."

Nothing about this proposed pension plan sounds as though it's for more than Burbach alone, and its execution leads us to no different conclusion.

**[*12]** Burbach adopted the Grant County Pension Plan in March 2003, though with an inexplicable effective date of January 1, 2001.[10] It was set up as a self-employed pension plan for Burbach alone and listed Grant County--rather than BAI--as the employer. As Eldridge's class handout foretold, Burbach funded the pension plan by taking "director fees" out of BAI, depositing them into his personal checking account, and making personal payments into the pension account. He reported the "director fees" on a Schedule C-EZ, Net Profit From Business, and then took offsetting deductions for contributions to a "Self-employed SEP, SIMPLE, and qualified plan[]."

How did everything else get reported?

D.    Burbach's Tax Filings

Since his business's founding in 1978, Burbach had prepared and filed his own tax returns--even the Schedules C, Profit or Loss From Business--and he claimed that he'd never filed late. He started farming out his tax preparation to Eldridge in 2002. Eldridge did a poor job--for some time he did nothing at all except cash Burbach's checks. As of May 2007 he hadn't prepared a single

---

[10] Burbach claims that, at that time, he saw only the signature page of the plan-adoption agreement, and that it would be another four years or so before he saw all the plan documents. We find this hard to believe and, if true, it shows a lack of ordinary business care.

**[*13]** corporate return and, with the exception of the 2004 tax year, didn't prepare Burbach's personal returns either.

The root of the problem, according to Burbach, is that Eldridge insisted that C corporations--such as BAI--have six years to file a tax return. This seemed to be Eldridge's version of Professor Hill's Revolutionary Think System applied to tax law--no need to prepare returns or keep records, just think positive thoughts. Burbach says that he questioned Eldridge about this, but ultimately relied on him. We do not find Burbach's testimony on this point to be credible: He had timely filed his own returns for decades--returns that included his business income and losses--and he is a sophisticated businessman. His actions also show that he didn't trust Eldridge's wacky claim that corporations have six years to file their returns. Burbach must have known this was nonsensical, because he traveled to Florida in 2007 to confront Eldridge about his failure to file corporate returns, well before any six-year deadline had passed. And while he was in Florida, Burbach made the excellent point that Eldridge also failed to file his personal returns on time--the last one that Eldridge prepared and filed was for 2004, and he didn't complete it until October 2006. Burbach's claims of reliance on Eldridge about the due date for his corporate returns are incredible and, even if they are true, unreasonable.

[*14] Burbach finally had had enough. When he returned to Florida to confront Eldridge, he met Reggie DeCotret, "a disgruntled employee of A-1 Accountants." According to Burbach, "DeCotret was * * * reported to be a CPA, and he was an employee of A-1 Accountants" assigned to Burbach's account.[11] DeCotret told Burbach that Eldridge was a brilliant tax planner "but that he was slow on his service." DeCotret and his colleague, Doris Allen, were frustrated and wanted to start their own accounting firm. Burbach figured they knew his business already, and they convinced him they could get his tax filings up to date. He thus became one of the first clients of their new firm--R&D Strategic Tax Planning, Inc. (R&D).[12]

---

[11] Burbach had a copy of DeCotret's resume at the time, and it's in the record. It says nothing about DeCotret's being a CPA, though it does make the hard-to-believe representation that he went to Harvard for "[m]anagement styles" and MIT for "[m]athematics".

[12] Their fee agreement was less costly than Eldridge's: $10,000 up front and $3,000 per month.

**[*15]** R&D started churning out returns. It promptly prepared BAI's corporate returns for 2003-06[13] and Burbach's individual returns for 2005-07. Here's the important bits of Burbach's original individual returns for the years at issue:

| Year | Wages | Schedule C income | Gross income | Qualified plan deduction | Taxable income |
|---|---|---|---|---|---|
| 2004 | $21,500 | $275,000 | $488,732 | $275,000 | $102,482 |
| 2005 | 19,925 | 167,964 | 254,704 | 167,964 | 32,515 |
| 2006 | 19,268 | 201,192 | 427,696 | 201,192 | 107,468 |
| 2007 | 19,253 | 221,664 | 422,716 | 221,664 | 91,573 |

And here's the big picture of BAI's original corporate returns for the years at issue:

| Year | Total income | Total deductions | Taxable income |
|---|---|---|---|
| 2003 | $1,643,523 | $1,550,807 | $92,716 |
| 2004 | 1,488,793 | 1,390,853 | 97,940 |
| 2005 | 1,688,916 | 1,693,882 | (4,966) |
| 2006 | 1,903,914 | 1,884,065 | 14,883[14] |

---

[13] BAI's fiscal year ends June 30. Therefore, all references to BAI's tax years at issue refer to the calendar years in which BAI's fiscal years began. For example reference to BAI's 2003 tax year refers to its tax year beginning July 1, 2003, and ending June 30, 2004.

[14] This total also includes a $4,966 NOL carried forward from the previous

(continued...)

| | | | |
|---|---|---|---|
| [*16]  2007 | 2,789,647 | 2,005,636 | 784,011 |

## E.    The Audit and Burbach's Self-Help

Burbach lost faith in R&D sometime in early 2008 and started preparing his and BAI's returns himself, including BAI's 2007 and 2008 returns.  Burbach's and BAI's original returns were finally up to date when the Commissioner began an audit in March 2008.  Burbach says he invited the revenue agent assigned to his case to meet with him and DeCotret because he "knew that * * * the filings had a lot of donations to the Blue Foundation, that these were eccentric, and [he] wanted her to see the whole operation."  Before the revenue agent's visit, Burbach claims he didn't see any flaws in his or BAI's returns; he says only that he "was very, very proud that we were caught up and * * * current with the filings."  He soon learned that the returns R&D prepared were "junk" and that his self-employed pension plan didn't work.  Burbach began fixing the problems himself.

He started by amending BAI's returns for 2003-07, which resulted in large net changes to the big-picture numbers:

| Year | Net change to total income | Net change to total deductions | Net change to taxable income |
|---|---|---|---|

---

[14](...continued)
year.

| | | | |
|---|---|---|---|
| [*17] 2003 | $365,671 | ($300,971) | $666,641 |
| 2004 | 727,769 | 92,770 | 635,000 |
| 2005 | 424,681 | (316,620) | 741,300 |
| 2006 | (266,866) | (658,780) | 391,913 |
| 2007 | -0- | 112 | (112) |

He also hired an employee-benefits lawyer named Timothy Stewart to review the Grant County Pension Plan and get it into compliance.

Stewart quickly concluded that the plan didn't work. As soon as he saw the adoption agreement and the basic plan document he "realized that [it] was set up as a one participant plan." Stewart thought that was a fairly obvious problem for Burbach because "an individual who owns a business with employees cannot have a one participant defined benefit pension plan." But he determined that there was a way to save the plan and its assets from drowning: the IRS's Voluntary Correction Program (VCP).

Stewart described the VCP at trial as a program "to sort of retroactively achieve" a plan's original intent, which he said he believed was to create an employer-sponsored plan for BAI. Burbach agreed to this salvage operation, and Stewart proved himself to be a competent adviser. He closely followed Rev. Proc. 2008-50, 2008-35 I.R.B. 464, and in October 2008 submitted a detailed

[*18] application for a compliance statement under the VCP. The VCP application described three plan faults and proposed three corrections:

| Fault | Proposed Correction |
|---|---|
| The plan's effective date should've been January 1, 2003, instead of January 1, 2001, because Burbach signed its adoption agreement in March 2003. | Amend the plan to change its effective date to January 1, 2003. |
| BAI should've been the plan sponsor, because it has several employees and, "in reality, all of the compensation on which Plan contributions were based was, in fact, W-2 compensation paid by the Company to Mr. Burbach as an employee" and not "board of director fees." | Restate the plan with BAI as its sponsor; "retroactively include all eligible employees in the Plan dating back to 2003;" and, "for Mr. Burbach, the amounts he received as 'director's fees' would all be included as 'compensation' for Plan purposes." |
| Burbach over contributed to the plan in 2003 and 2004. | Redetermine plan liabilities for the newly eligible employees--which would offset some of the excess contributions--and have Burbach make additional contributions to correct any underfunding. |

Stewart's key correction was to restate the plan with BAI as the sponsor. He said that it had been set up as a self-employed pension plan, funded by Burbach's purported director's fees. But Burbach was not self-employed; he was an officer and employee of BAI. Stewart knew that this meant that Burbach couldn't have a self-employed pension plan. Stewart also knew that he had to

[*19] reclassify these "director fees" to be both BAI's "deductible contributions to the plan and * * * compensation to Mr. Burbach on which those contributions could be made." He retained an actuary to determine the proper amount that BAI could contribute based on Burbach's highest three years of compensation out of the past ten--compensation that now included his "director fees."

After Stewart submitted Burbach's VCP application to the IRS, there was quite a bit of back and forth before all the details were ironed out. Their agreement took the form of a "compliance statement" in February 2010, which stated that the IRS "will not pursue the sanction of revoking the tax-favored status of the plan * * * on account of the failure(s) described in th[e] submission." Its cover letter stated, in part, "[a] compliance statement constitutes an enforcement resolution solely with respect to certain failures of an employee retirement plan that is intended to satisfy the requirements of the Internal Revenue Code," and "[a]t a later date, you may be required to verify that the correction of the failures and any modification of administrative procedures * * * have been timely made." This meant that BAI's pension plan was finally in compliance.

The Commissioner, however found still more problems with the returns. He made several adjustments in notices of deficiency that he issued in February 2012,

[*20] many of which Burbach and BAI conceded before trial.[15] The only issues

left to decide are:

- whether the "director fees" BAI paid to Burbach should be recharacterized as wages, and whether Burbach could deduct those fees when he contributed them to the pension plan;

- whether BAI was entitled to the depreciation deductions it took on numerous pieces of equipment and vehicles; and

- whether Burbach is liable for section 6651(a)(1) additions to tax, and whether BAI is liable for section 6651(a)(1) additions to tax and section 6662(a) penalties.[16]

OPINION

I.     "Director Fees" and Deductible Pension Contributions

Burbach argues that his "director fees" aren't wages because they weren't

compensatory--he used them only to make contributions to the pension plan. He

adds that these contributions were proper and timely, and therefore deductible

---

[15] Burbach and BAI timely filed petitions with our Court, and the parties stipulated that these cases are appealable to the Seventh Circuit. See sec. 7482(b)(2).

[16] The Commissioner has the burden of production for the additions to tax he determined against Burbach. See sec. 7491(c). He doesn't have the burden of production for the additions to tax and penalties he determined against BAI, see NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006); even if he did, he's met the supervisory-approval portion of it by stipulation, see sec. 6751(b)(1); Graev v. Commissioner, 149 T.C. 485, 492-94 (2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing and overruling in part 147 T.C. 460 (2016).

**[*21]** under section 404.  The Commissioner argues that Burbach's "director fees" are wages because they are remuneration for services he performed as an employee of BAI.  And, if they are, the Commissioner says Burbach can't take section 404 deductions because he has no self-employment income and BAI is the only entity entitled to any such deductions.

### A.     Wages v. "Director Fees"

The decisive question here is whether BAI paid Burbach the "director fees" for services he performed as an employee or as an independent contractor.  See Pariani v. Commissioner, T.C. Memo. 1997-427, 1997 WL 582144, at *2; Jacobs v. Commissioner, T.C. Memo. 1993-570, 1993 WL 495594, at *2.

There's no doubt that the Commissioner wins this one.  Our caselaw tells us to look at the employment-tax rules to decide this issue, and those rules say that "any officer of a corporation" is an employee except one who "does not perform any services or performs only minor services and who neither receives nor is entitled to receive, directly or indirectly, any remuneration."  Sec. 3121(d)(1); sec. 31.3121(d)-1(b), Employment Tax Regs.; see also Pariani, 1997 WL 582144, at *2-*3; Jacobs, 1993 WL 495594, at *2.  Burbach is BAI's sole shareholder and president; the record indicates his hands-on involvement in the company's day-to-day affairs as a soil morphologist and one of only three registered engineers at the

[*22] company; and BAI paid him wages in all the years at issue. This strongly suggests that Burbach was an "employee" of BAI in the years at issue. But he still might be able to swim to safety: He was also the sole director of BAI, and the regulations say that "[a] director of a corporation in his capacity as such is not an employee of the corporation." Sec. 31.3121(d)-1(b), Employment Tax Regs.

There is then a factual question: Did BAI pay Burbach for services he performed as an officer-employee or as a director? See Jacobs, 1993 WL 495594, at *2 (citing Rev. Rul. 82-83, 1982-1 C.B. 151, 152). Directorial services typically include things like attending board meetings and sitting on committees, while services performed by officers generally include the fundamental everyday decisions about corporate operations. See id. (citing Rev. Rul. 82-83, 1982-1 C.B. at 152; Rev. Rul. 68-595, 1968-2 C.B. 378, 379; Rev. Rul. 57-246, 1957-1 C.B. 338, 340). The problem for Burbach on this factual question is that he didn't present any evidence of specific directorial services he performed for BAI, and all the glimpses we have into his work at BAI involve everyday decisions about engineering, project management, and marketing. We also recognize that the "director fees" BAI paid Burbach in the years at issue were approximately ten times the "wages" it paid him, see supra p. 15, and that salary arrangements between closely held corporations and their shareholders deserve extra scrutiny,

[*23] with a taxpayer's characterization of them holding little weight in our analysis, see Jacobs, 1993 WL 495594, at *2-*3 (citing Spicer Accounting, Inc. v. United States, 918 F.2d 90, 92 (9th Cir. 1990)); cf. sec. 31.3121(d)-1(a)(3), Employment Tax Regs. Indeed, the large difference between reported "wages" and "director fees" in this case makes us all the more skeptical about the true nature of the latter.

We find that none of the payments Burbach received from BAI were for services he performed as a director of the company; they were instead all made to him for services he performed as an officer-employee.[17] We therefore sustain the Commissioner's determination to recharacterize Burbach's "director fees" as wages.

---

[17] Burbach's position that the "director fees" aren't wages is also inconsistent with representations he and BAI made to the IRS in their application for a compliance statement for the pension plan. They said that, "in reality, all of the compensation on which Plan contributions were based was, in fact, W-2 compensation paid by [BAI] to Mr. Burbach as an employee" and stated that the "amounts [Burbach] received as 'director's fees' would all be included as 'compensation' for Plan purposes." We recognize that the compliance statement isn't a closing agreement under section 7121. But Burbach's and BAI's representations to the IRS about Burbach's compensation still bolster our finding; they are also consistent with the other facts in evidence that show BAI's payments to Burbach were for the services he performed as an officer-employee.

[*24] B.     Deductible Pension Contributions

There is another reason Burbach's deduction of these contributions to BAI's pension plan must fail:  Section 404(a)(1) allows only an "employer" to claim such deductions, unless the employer is self-employed.  See sec. 404(a)(8).

Burbach can't successfully claim to be an employer, and section 404(a) limits deductions under section 404(a)(1) to contributions made to pension trusts by "an employer."  The plan sponsor and "employer" in this case is BAI, not Burbach.

But might section 404(a)(8)'s exception for the self-employed work instead?  That section permits a self-employed taxpayer to deduct certain contributions to a pension plan.  See sec. 404(a)(8).  It does so by redefining the terms "employee" and "employer"; it says that "the term 'employee' includes an individual who is an employee within the meaning of section 401(c)(1), and the employer of such individual is the person treated as his employer under section 401(c)(4)."  Id.  Under section 404(a)(8)(C), contributions to a pension plan "on behalf of an individual who is an employee within the meaning of section 401(c)(1) shall be * * * [deductible] to the extent that such contributions do not exceed the earned income of such individual * * * derived from the trade or business with respect to which such plan is established."  Section 401(c)(4) says

**[\*25]** that "[a]n individual who owns the entire interest in an unincorporated trade or business shall be treated as his own employer." And section 401(c)(1)(A) provides that an "employee" is "an individual who is a self-employed individual," and section 401(c)(2)(A) provides that a "self-employed individual" is an individual who has "net earnings from self-employment (as defined in section 1402(a))."

This last part is where Burbach's claim fails: Section 1402(a) provides that "net earnings from self-employment" means gross income from "any trade or business," less deductions "which are attributable to such trade or business." But section 1402(c)(2) clarifies that "trade or business" for this purpose excludes "the performance of services by an individual as an employee."[18] We've already found that all of Burbach's earnings from BAI in the years at issue were for services he performed as an *employee* of BAI. He therefore is not entitled to deductions under section 404(a)(8) for any contributions he made into BAI's pension plan for the years at issue. See also, e.g., Jacobs, 1993 WL 495594, at \*4.

---

[18] There are a number of exceptions to this rule in section 1402(c)(2), none of which applies here.

**[*26]** II.    Depreciation and Section 179 Deductions

Section 167(a)(1) allows depreciation deductions "for the exhaustion, wear and tear" of property used in a taxpayer's trade or business, determined under section 168(a) on the basis of the applicable depreciation method, convention, and recovery period. For some depreciable property, a taxpayer can accelerate depreciation by deducting its cost as an expense in the taxable year in which the property is placed in service. See sec. 179(a). A taxpayer can claim depreciation deductions only for property it owns, Arevalo v. Commissioner, 124 T.C. 244, 251-52 (2005), aff'd, 469 F.3d 436 (5th Cir. 2006), and can start depreciating property only when it first places the property into service in its trade or business, sec. 1.167(a)-10(b), Income Tax Regs. To prove entitlement to a depreciation deduction, a taxpayer must also establish the property's depreciable basis by substantiating its cost, recovery period, and any previous allowable depreciation. See Cluck v. Commissioner, 105 T.C. 324, 337 (1995). And for depreciation deductions on any "listed property," a taxpayer must meet section 274(d)'s heightened substantiation requirements. See secs. 274(d)(4) (2008), 280F(d)(4); see also, e.g., WSK & Sons, Inc. v. Commissioner, T.C. Memo. 2015-204, at *12-*13 (outlining section 274(d) requirements for passenger automobiles).

**[\*27]** The parties stipulated before trial a list of BAI's depreciation deductions that remain in dispute. BAI would normally have the burden of proving its entitlement to the disputed deductions, see Rule 142(a), but at trial we shifted that burden to the Commissioner under section 7491(a) because we found that BAI had cooperated with the Commissioner's requests for information on this issue and had produced credible evidence to substantiate its deductions. We will therefore hold that BAI's entitled to the disputed deductions, unless we find that the Commissioner has proved by a preponderance of evidence that it is not otherwise.

We reproduce part of the parties' stipulated list of disputed depreciation deductions. To make our analysis somewhat easier to follow, the last column in our table either states that the Commissioner has conceded an issue or includes a letter that denotes the section where we discuss items with common issues.

[*28]

| Property | Date placed in service | Cost | § 179 expense | 2003 § 167 deduction | 2004 § 167 deduction | 2005 § 167 deduction | 2006 § 167 deduction | 2007 § 167 deduction | Commissioner's reason for disallowance |
|---|---|---|---|---|---|---|---|---|---|
| Computer equip. | 12/30/2000 | $17,493 | -- | $2,015 | $2,015 | -- | -- | -- | C |
| Office equip. | 12/30/2000 | 38,560 | -- | 5,780 | 4,130 | $3,441 | $3,441 | $3,441 | C |
| Color copier | 12/2/2002 | 1,685 | $1,175 | 163 | 98 | 59 | 59 | 29 | Concedes |
| Equipment--Krom. | 4/15/2003 | 7,000 | 7,000 | -- | -- | -- | -- | -- | A |
| Equipment--Henn. | 6/18/2003 | 15,825 | 15,825 | -- | -- | -- | -- | -- | A |
| 4630 Equipment-- Cherokee | 7/15/2003 | 15,000 | 15,000 | -- | -- | -- | -- | -- | B |
| Equipment--Henn. | 7/23/2003 | 3,200 | 3,200 | -- | -- | -- | -- | -- | B |
| TC Equipment-- Henn. | 8/1/2003 | 13,750 | 13,750 | -- | -- | -- | -- | -- | B |
| Equipment--F&F | 8/11/2003 | 1,513 | 1,513 | -- | -- | -- | -- | -- | A |
| Equipment--Henn. | 8/13/2003 | 19,113 | 19,113 | -- | -- | -- | -- | -- | B |
| 1510 Equipment-- Alpha | 9/8/2003 | 6,500 | 6,500 | -- | -- | -- | -- | -- | E |
| Equipment--Krom. | 10/20/2003 | 5,850 | 5,850 | -- | -- | -- | -- | -- | E |
| 1520 Equipment-- Alpha | 10/31/2003 | 9,800 | 9,800 | -- | -- | -- | -- | -- | E |
| 1620 w/RC Equipment--Krom. | 12/19/2003 | 10,250 | 10,250 | -- | -- | -- | -- | -- | E |

| [*29] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Telephone System | 12/31/2003 | 4,514 | 4,514 | -- | -- | -- | -- | -- | F |
| TC33D Equipment--Krom. | 9/29/2004 | 14,500 | 14,500 | -- | -- | -- | -- | -- | E |
| GPS System | 10/7/2004 | 1,739 | 1,739 | -- | -- | -- | -- | -- | E |
| BA463 2005 Mustang | 11/20/2004 | 28,617 | -- | -- | 2,960 | 4,700 | 2,850 | 1,675 | E |
| Equipment--Sears | 2/26/2005 | 3,880 | 3,880 | -- | -- | -- | -- | -- | D |
| BA201 2001 Mustang | 5/6/2005 | 11,500 | 800 | -- | 2,140 | 3,424 | 2,054 | 1,233 | E |
| Computer Equipment | 7/22/2005 | 1,948 | 1,948 | -- | -- | -- | -- | -- | Concedes |
| Ford 1320 Equip.--Krom. | 10/21/2005 | 6,000 | 6,000 | -- | -- | -- | -- | -- | C |
| Ford 2000 Equip.--Krom. | 10/21/2005 | 2,950 | 2,950 | -- | -- | -- | -- | -- | E |
| Ford 2120--D.A. Auto | 10/24/2005 | 11,300 | 11,300 | -- | -- | -- | -- | -- | E |
| Toolbox--Sears | 3/10/2006 | 4,853 | 4,853 | -- | -- | -- | -- | -- | D |
| MC28 w/md Equip.--Henn. | 4/17/2006 | 6,000 | 6,000 | -- | -- | -- | -- | -- | E |
| TC55 Equipment--Henn. | 3/30/2007 | 22,400 | 22,400 | -- | -- | -- | -- | -- | C |
| TZ22 Equipment--Henn. | 3/30/2007 | 9,700 | 9,700 | -- | -- | -- | -- | -- | E |
| BA028 2008 Mustang | 4/15/2008 | 26,600 | 7,000 | -- | -- | -- | -- | 3,920 | E |
| BA884 2007 Mustang | 4/15/2008 | 36,859 | 4,400 | -- | -- | -- | -- | 6,492 | E |
| Laptop | 3/19/2008 | 1,659 | -- | -- | -- | -- | -- | 332 | Concedes |

**[\*30]** A.    <u>Property That Should Have Been Expensed in an Earlier Year</u>

The Commissioner argues that BAI placed these assets in service before its 2003 tax year--the year BAI claimed a section 179 deduction for them.  BAI's own records say the "Equipment--Krom." and the "Equipment--Henn." were placed in service after the start of its 2003 tax year.  But BAI admitted on brief that "[t]he evidence shows that these two items were purchased  \* \* \* and were depreciated under § 179 for the tax year ended June 30, 2003 only" (i.e., BAI's 2002 tax year).  BAI could expense the cost of these items under section 179(a) only in the year they were placed in service; it is therefore not entitled to section 179 deductions for any year other than its 2002 tax year.

The Commissioner's argument about BAI's section 179 deduction for the cost of the "Equipment--F&F" is a little different.  The table shows that that property was placed in service in August 2003, which is within BAI's 2003 tax year.  The Commissioner argues, though, that a store-credit statement in evidence shows that BAI bought the property on June 22, 2003--a week before its 2003 tax year started--and that there is no evidence that the property was actually placed in service after that date.  The regulations tell us that property is placed in service in the tax year in which it is "placed in a condition or state of readiness and availability \* \* \* in the production of income."  Sec. 1.167(a)-11(e)(1)(i), Income

[*31] Tax Regs. This includes replacement parts "acquired and set aside during the taxable year" and farm equipment acquired during one taxable year even if not practicable to use until the following year. Sec. 1.46-3(d)(2)(i) and (ii), Income Tax Regs.; sec. 1.167(a)-11(e)(1)(i), Income Tax Regs. (stating that section 1.46-3(d)(2) applies for purposes of determining when property is placed in service). While we admit that a week's difference seems minor, we don't have information to determine that the equipment wasn't "in a condition or state of readiness" when it was purchased during BAI's 2002 tax year. The only information we have is the date BAI bought it with a line of credit, and a copy of a BAI check that shows how it was paid for. That lets us find it very slightly more likely than not that this equipment was ready for use when BAI bought it, but was set aside for use a little later. BAI is not entitled to this 179 deduction either.

### B. BAI Does Not Own the Property

The Commissioner argues that BAI can't take a section 179 deduction for these tractors, mowers, and implements because "[t]here is no documentation showing BAI ever owned these tractors." See, e.g., Arevalo v. Commissioner, 124 T.C. at 251-53 (taxpayer must own the property to deduct its cost). He thinks that checks in the record indicate that BA, LLC, rather than BAI, bought the assets, which he finds significant because Burbach testified that BAI bought its own

[*32] tractors.  Burbach acknowledged that he bought these items with BA, LLC checks, but argues that that means nothing--BA, LLC had been dissolved before these items were purchased, and BAI had replaced it as Burbach's operating entity.  We believe Burbach here--his testimony of his parsimony in using up old checks before moving onto new ones was credible.  BAI wins these.

The Commissioner also had a more specific issue with one item-- "Equipment--Henn.", placed in service in August 2003.  He points out that this item was actually four different items according to BAI's inventory sheet, yet that the total depreciation taken for this "Equipment--Henn." accounts for only three items.  We find this to be a small error on BAI's part that likely results in a slightly smaller deduction.  BAI is entitled to these deductions.

### C.    Insufficient Substantiation of Basis

The Commissioner argues that BAI can't deduct depreciation for these items because it hasn't established depreciable bases for them.  The first item to address--the "Computer equip."--is listed property, unless it falls within the exception for computer equipment "used exclusively at a regular business establishment."  Sec. 1.280F-6(b)(1)(iv), (5), Income Tax Regs.  The Commissioner wins this one by proof that BAI lacked documentation to fall within the exception, which means BAI is subject to heightened substantiation

[*33] requirements under section 274(d). And he wins disallowance of BAI's deduction for these items because BAI provided only a one-page handwritten chart showing estimated depreciation. This chart does not confirm the equipment's purchase price, let alone its use and purpose in BAI's business. It is equally difficult for us to confirm BAI's depreciable basis in the office equipment, even though it's not listed property, because the Commissioner showed that BAI's only evidence of its basis was the same one-page handwritten chart.

Turning to the other items under this section--"Ford 1320 Equip.--Krom." and "TC55 Equipment--Henn."--we find that BAI has again provided only homemade one-pagers that cannot allow us to confirm the assets' depreciable bases. As the Commissioner shows, there is no proof in BAI's records of their price, and Burbach even testified at trial that no such documentation was in the record. BAI is not entitled to any of these deductions.

D.      Insufficient Substantiation of Ownership and Business Use

The Commissioner argues that BAI can't take section 179 deductions for these items because, though it has provided substantiation, it hasn't produced sufficient documentation to prove that it owned the items and used them in its trade or business. Regarding the "Equipment--Sears", the Commissioner says that BAI "could easily have provided documentation showing who the cardholder of

[*34] the credit account [used to buy the assets] was, but chose not to. It should be presumed that the credit cardholder was not BAI and the items were likely purchased personally or by an entity other than BAI." We disagree and find that the Commissioner fails to meet his burden of proof on this issue because the equipment is of a type useful in BAI's business and the record contains a copy of the check BAI used to pay the credit card balance.[19] BAI is entitled to this deduction.

The "Toolbox--Sears", however, is a bit different. The Sears account statement lists a tool "chest" that could very well be used in BAI's business, but it fails to identify the name on the account. And as the Commissioner points out, there is nothing in BAI's records to show how it was paid for or who paid for it. BAI is not entitled to this deduction.

E.      Insufficient Substantiation of Business Use

Most of BAI's remaining section 179 deductions are lumped together in this section. The Commissioner argues that they should be disallowed because the substantiation BAI turned over is insufficient to show that the items--including tractors, mowers, and Ford Mustangs--were used in BAI's trade or business rather

---

[19] We note that it appears this BAI check was written to cover the full balance on the credit card, which could also arguably contain some of Burbach's personal expenses. BAI's payment of these expenses, however, is not at issue.

**[\*35]** than by Burbach personally. He argues that this is particularly true for the Ford Mustangs, which he says are subject to the heightened substantiation requirements of section 274(d). Section 274(d)'s substantiation requirements for listed property are laid out in the regulations, which specify that adequate records in the form of a diary, log, trip sheet, statement of expense, etc. are required, sec. 1.274-5T(c)(2)(ii), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985), to show each separate expenditure, the amount of each business use and total use, and the business purpose of each item of property, see id. para. (b)(6), 50 Fed. Reg. 46016. These requirements are in addition to establishing depreciable basis and ownership.

The Commissioner makes some interesting arguments about BAI's *need* for all these cars to operate its business--especially in light of Burbach's personal affinity for Ford products. To substantiate its use of four Mustang vehicles--"2005 Mustang," "2001 Mustang," "2008 Mustang," and "2007 Mustang"--BAI provided "asset inventory" sheets, copies of checks BAI used to purchase the vehicles, purchase agreements, and maintenance invoices for some of the vehicles. We agree with the Commissioner that this documentation falls short of what section 274(d) requires, and find that he has met his burden on these vehicles. He's proved that it is more likely than not that BAI has no mileage documentation,

**[*36]** no documentation regarding the amount and type of use of these vehicles, and no certificates of title for most of them. A certificate of title provided for the "2008 Mustang" showed mileage of just 97 miles, suggesting it sat essentially unused. The Commissioner also pointed out that BAI had its own service bays, making the already spotty maintenance records more questionable. There are further issues with the documentation on the Mustangs, but we think this suffices. BAI is not entitled to these deductions.

Beyond the Mustangs, the Commissioner argues that the business use of 10 other items was not properly substantiated. These items include:

- "1510 Equipment--Alpha" (a diesel engine mower);

- another "Equipment--Krom." (a tiller);

- "1520 Equipment--Alpha" (tractor);

- "1620 w/RC Equip.--Krom.";

- "TC33D Equipment--Krom.";

- "GPS System";

- "Ford 2000 Equip.--Krom." (tractor);

- "Ford 2120--D.A. Auto" (tractor);

- "MC28 w/md Equip.--Henn."; and

- "TZ22 Equipment--Henn." (mower).

**[*37]** We'll start by briefly discussing the items of depreciation that we find BAI is entitled to. The Commissioner hasn't met his burden of proof for the "Equipment--Krom." tiller, the "1520 Equipment--Alpha" tractor, the "Ford 2120 --D.A. Auto" tractor, the "Ford 2000 Equip.--Krom," and the "TZ22 Equipment-- Henn." mower. The documentation for these items shows the proof and cost of BAI's purchases and also states credible business uses. The Commissioner dismisses these items because of their traditional use as farm equipment and through comparison to other pieces of nonbusiness equipment owned by Burbach that are not at issue. Burbach credibly testified to these items' relevance in BAI's business. For example, Burbach testified that the Krom tiller was used to conduct soils investigations before "opening the ground" for a project. Specifically regarding the "TZ22 Equipment--Henn." tractor, the Commissioner argues that this tractor was purchased in March 2003, a year not at issue. Our own review of the invoice for this tractor shows a purchase date of March 2007, and we therefore disagree with the Commissioner. BAI is entitled to these deductions.

Now to the items we disallow. Starting with the "1510 Equipment--Alpha" mower, we agree with the Commissioner that BAI bought this item in March 2003, before any of the years at issue. The check BAI provided to confirm its purchase shows the mower was placed in service in 2002 rather than 2003, if it

[*38] was placed in service at all.[20]  See sec. 1.167(a)-10(b), Income Tax Regs. The "1620 w/RC Equip.--Krom." tractor presents a problem because the documentation on this item shows that it may have been purchased by Burbach, even though he used a BAI check for payment.  We therefore can't be sure that this item was truly BAI's property and not Burbach's personal property.  The "TC33D Equipment--Krom." tractor and the "GPS System" are likewise unsubstantiated for the same reason.  Their documentation also lacks BAI inventory sheets with a stated business use.  Finally, we find that the Commissioner has shown by a slight preponderance of evidence that BAI didn't own the "MC28 w/md Equip.--Henn."  There's a letter from Burbach to Bill Hennessey in the record in which he asked that repairs on the tractor be billed to BFI.  BAI cannot take these deductions.

F.     Double Deduction

The final section concerns the section 179 deduction BAI claimed on its amended 2003 tax return for its telephone system.  The Commissioner argues that BAI deducted this amount as a section 162 business expense on its original 2003 return and then, after the Commissioner allowed that deduction during the

---

[20] We note that the Commissioner could have argued this item with the other items falling under the wrong-year-to-expense issue.

[*39] examination, doubled-up by reporting it once more as a section 179 deduction on its amended 2003 return. BAI responded that the Commissioner "offered no evidence that * * * [the] []phone system[] was deducted twice. Mr. Burbach credibly testified, without contradiction, that this item was characterized as a depreciable asset when BAI prepared its amended returns. We saw no evidence that BAI had deducted it on its original return, and the Commissioner didn't introduce any other evidence that it had. BAI is entitled to this deduction.

G.    Conclusion

With our analysis of that long list finally complete, we find that BAI is entitled to the following disputed section 179 deductions:

- "4630 Equipment--Cherokee" for $15,000;

- "Equipment--Henn." for $3,200;

- "TC Equipment--Henn." for $13,750;

- "Equipment--Henn." for $19,113;

- "Equipment--Krom." for $5,850;

- "1520 Equipment--Alpha" for $9,800;

- "Telephone System" for $4,514;

- "Equipment--Sears" for $3,880;

- "Ford 2000 Equip.--Krom." for $2,950;

[*40]  ●      "Ford 2120--D.A. Auto" for $11,300; and

●      "TZ22 Equipment--Henn." for $9,700.

All other deductions are disallowed.

III.    Additions to Tax and Penalties

A.    Section 6651(a)(1) Failure-To-File Additions to Tax

Section 6651(a)(1) imposes an addition to tax for failure to timely file a tax return unless the taxpayer can establish reasonable cause.  The Commissioner has no burden of production under section 7491(c) for the additions to tax he determined against BAI, see NT, Inc., 126 T.C. at 195, and he met his burden of production for the additions to Burbach's tax by stipulation.  Burbach and BAI assert as a defense, however, that they each had reasonable cause for filing late because they relied on Eldridge's erroneous advice about their returns' due dates.

We reject Burbach's reasonable-cause defense.  He prepared his own tax returns long before he met Eldridge, and he testified that he knew individual tax returns were due April 15 of the following year.  While it's true that "[m]ost taxpayers are not competent to discern error in the substantive advice of an accountant or [an] attorney," United States v. Boyle, 469 U.S. 241, 251 (1985), Burbach was not "most taxpayers."  Burbach did not exercise ordinary business care and prudence by relying on advice that he knew, or should've known, was

[*41] wrong, see sec. 301.6651-1(c), Proced. & Admin. Regs., and we won't therefore excuse his late filing, see, e.g., Estate of La Meres v. Commissioner, 98 T.C. 294, 317 (1992) (reliance on erroneous professional advice about filing requirement is in good faith only if the "taxpayer did not otherwise know that the return was due"). We find for the Commissioner on these additions to tax.

Our analysis of BAI's reasonable-cause defense turns on whether BAI reasonably and in good faith relied on Eldridge's advice about the erroneous six-year due date for corporate returns. We have consistently held that reliance on erroneous professional advice about the due date for a tax return can constitute reasonable cause only if "such reliance was reasonable under the circumstances." Estate of La Meres, 98 T.C. at 318; see also Boyle, 469 U.S. at 251 n.9 (citing a slew of Tax Court cases for that proposition). Burbach claims that Eldridge was adamant about the six-year due date for corporate returns; he says Eldridge even proved it with an article that supposedly showed the Ford Motor Company had eight years to file its return. But the record is replete with examples of Burbach's growing anxiety about BAI's unfiled returns: He testified that he pushed Eldridge about the returns--in Burbach's experience, they had to be filed the next quarter after the tax year ended--and he even traveled to Florida to confront Eldridge before any return would've been due under a six-year time limit. This well-

[*42] founded anxiety, and Burbach's own experience, lead us to find that BAI did not rely in good faith on Eldridge about the six-year due date and, even if it did, that reliance was unreasonable under the circumstances. See Estate of La Meres, 98 T.C. at 316-18. We also find for the Commissioner on this addition to tax.

B.      Section 6662(a) Accuracy-Related Penalties

The Commissioner also determined penalties against BAI under section 6662(a), which imposes a 20% penalty for an underpayment attributable to "[n]egligence or disregard of rules or regulations" or a "substantial understatement of income tax." See sec. 6662(a), (b)(1) and (2), (c), (d). The Commissioner has no burden of production on these penalties under section 7491(c),[21] see NT, Inc., 126 T.C. at 195, but BAI argues that it shouldn't be held liable for them because it had reasonable cause and acted in good faith, see sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs.

BAI hopes to cross the reasonable-cause threshold on the backs of Eldridge and DeCotret for all of the penalties. It argues that it paid Eldridge and then DeCotret a considerable amount of money to properly prepare its returns; it

---

[21] Even if he did, BAI conceded on brief that there was a substantial understatement of income tax for each year at issue under section 6662(d)(1)(B). And, as we've said, the Commissioner met any supervisory-approval portion of his burden of production by stipulation. See supra note 16.

**[*43]** provided them with all information necessary to complete the returns; and, when it learned during audit of DeCotret's substantial mistakes, it took corrective action and filed amended returns.[22] A taxpayer can establish reasonable cause and good faith by reliance on professional advice. The regulations circularly state that reliance on professional advice is "reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6664-4(b)(1), Income Tax Regs. Our caselaw clarifies this defense with three factors to determine whether a taxpayer properly relied on professional advice:

- First, was the adviser a competent professional who had sufficient expertise to justify reliance?

- Second, did the taxpayer provide necessary and accurate information to the adviser?

---

[22] We note that BAI doesn't argue that its amended returns are "qualified amended return[s]" within the meaning of section 1.6664-2(c)(2), Income Tax Regs.--and for good reason. Section 1.6664-2(c)(3)(i)(A), Income Tax Regs., provides that "[a] qualified amended return is an amended return, * * * filed after the due date of the return for the taxable year * * * and before * * * [t]he date the taxpayer is first contacted by the Internal Revenue Service (IRS) concerning any examination * * * with respect to the return." Because BAI submitted the amended returns while under audit, they are not "qualified amended return[s]." And BAI waived any qualified-amended-return argument by failing to raise it on brief. See Rule 151(e); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Tufft v. Commissioner, T.C. Memo. 2009-59, 2009 WL 722051, at *6.

**[*44]** ●     Third, did the taxpayer actually rely in good faith on the adviser's judgment?

See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

As to the second factor, BAI has established to our satisfaction that it provided Eldridge and then DeCotret with information necessary to complete its returns for the years at issue. And the Commissioner hasn't argued to the contrary.

BAI does struggle, however, with the first and third factors. Nothing in the record convinces us that Eldridge and DeCotret were competent professionals with sufficient expertise to justify reliance. Burbach's testimony is laced with references to Eldridge's status as an enrolled agent, but the Commissioner correctly points out that Burbach never verified Eldridge's status with the IRS or even looked into what an enrolled agent actually is. Even if he had, Burbach's initial contacts with Eldridge should've thrown up more red flags than Florida in hurricane season. Burbach paid Eldridge $1,200 for a two-day class at which Eldridge provided a class handout that is comprehensible only in its descriptions of aggressive tax-avoidance schemes--Eldridge encouraged Burbach to apply "Rule of Law" to "stop the 445 legal thieves" in Washington and "stop paying maximum taxes to the Grizzly Bear." Based on his promise to help Burbach end

[*45] his "intimate daily love relationship" with the IRS, Burbach began paying Eldridge an outrageous monthly fee, a fee he continued to pay even when Eldridge didn't get the work done and used an absurd six-year due date as an excuse. Eldridge could not have been confused with a competent tax professional.

And DeCotret is only marginally better. When Burbach met him, he was working for Eldridge. Calling into question his own competence, he said that Eldridge "was brilliant" at tax planning, if a little slow on service. Burbach says that DeCotret told him he was a CPA and, much as he had with Eldridge, Burbach took that qualification at face value, but he didn't notice that DeCotret's resume said nothing about being a CPA. DeCotret at least prepared returns for BAI but, in doing so, followed Eldridge's erroneous tax planning, grossly understated income, and grossly overstated deductions. Burbach didn't give the returns much of a review before they were filed, and when he finally did, he discovered many reporting mistakes. DeCotret was not a competent tax professional on whom BAI could reasonably rely.

This all shows that BAI didn't reasonably and in good faith rely on Eldridge's or DeCotret's judgment. "[U]nconditional reliance on a preparer or adviser does not always, by itself, constitute reasonable reliance; the taxpayer must also exercise '[d]iligence and prudence'." <u>Owen v. Commissioner</u>, T.C.

**[\*46]** Memo. 2012-21, 2012 WL 162613, at \*19 (quoting <u>Marine v. Commissioner</u>, 92 T.C. 958, 992-93 (1989), <u>aff'd without published opinion</u>, 921 F.2d 280 (9th Cir. 1991)). BAI had to *reasonably* rely on Eldridge and DeCotret, but the information we have about Burbach's encounters with Eldridge show reliance on him was anything but reasonable. Burbach himself also admitted that, once he spent more time reviewing the returns DeCotret had prepared, he was able to identify significant reporting errors in gross income and deductions--errors that resulted in BAI's reporting over $800,000 in additional tax liability on its amended returns. These are reporting errors that Burbach should've identified before the returns were filed, and "[r]eliance on a preparer \* \* \* does not constitute reasonable cause if the taxpayer's cursory review of the return should have revealed errors." <u>Id.</u> (citing <u>Metra Chem Corp. v. Commissioner</u>, 88 T.C. 654, 662-63 (1987)). We therefore find for the Commissioner on these penalties as well.

This is a mixed result, so

<u>Decisions will be entered under</u>

<u>Rule 155</u>.
